## SAME vs. SAME.

Where the order of the court which refers a cause to a commissioner to state an account between the parties, required him to ascertain the amount of "necessary improvements" upon lands; it is proper for the commissioner to take into consideration the situation and relations of the parties to the land under their contract; so that where the parties are the proprietors of a town plat, and by expending considerable sums, in the repair of mills, dams, &c., in existence, and other improvements of a public character, settlers would be attracted to the town, even though the improvements might not of themselves be profitable, yet if the collateral advantages resulting from the investment to the other property, and the town, were such as a judicious man would make; then such improvements should be considered by the commissioner as "necessary."

Where one of two tenants in common is authorized to make "necessary improvements" upon the common land, and he make improvements according to his best judgment, and as a prudent and vigilant man would have made them, he is entitled to be paid by his co-tenant for the proportionate share of the expense incurred in making the improvements, even though it should turn out that the improvements could have been made more advantageously.

The order of the court required the commissioner to state the account between co-tenants, of the value of improvements made by them upon the property, and such as were necessary and required for the due use and preservation thereof; this order would not embrace new improvements, made after suit brought and *pendente lite;* but the account must stop at the date of the filing of the bill, except as to the account for use and preservation.

Parties accounting before a commissioner should bring in their accounts in the form of debit and credit; and be confined to the matters referred to the commissioner, and arising strictly between the parties. And where the commissioner allowed accounts, kept by one of the parties in his books under various heads, and which did not allude to the other party, nor did they appear to have any connection with the dealings of the party to be charged; the report allowing such accounts must be set aside, and the matter again referred to have the statement corrected.

An order requiring a commissioner to state an account for the rents and profits of property, consisting of mills, buildings, &c., does not authorize the commissioner to take an account of the expense of running the mills and conducting the business, &c., also the credits arising from the mills, &c., if one of the parties have been in the exclusive possession of the property.

An order referring a cause to a commissioner to state an account between the parties, to take proofs as to the amounts received by either party from the

Reed vs. Jones and Drury.

sales of any portion of the property previous to the filing of the bill of complaint, does not authorize the commissioner to take an account of property sold *pendente lite.*

The Supreme Court, will not, as a general thing, make a final decree in a cause appealed to it; much less will it do so when the facts cannot be determined except by a reference to a commissioner; or where a commissioner has improperly admitted evidence on an accounting in the case.

The case being again before the circuit court for Marquette county, it was referred to Satterlee Clark, a court commissioner, who notified the parties to appear before him, and state an account between them. His report shows that upon the examination the defendants introduced their accounts, numbered from 1 to 73, purporting to be an account of expenditures and receipts from July 23, 1846, to the time of taking the account, February 27, 1856; that is, from the date of the agreement between Reed and Jones for the sale of the land. These accounts are entitled as follows: 1st. Mill Account, No. 1; 2d. Neenah mills to Jones and Yale; 3d. Jones and Yale's account with Neenah mills; 4th. Neenah mills account, No. 2; 5th. Interest account of expenditures and receipts; 6th. Neenah mills to Harvey Jones; 7th. Neenah grist mill account; 8th. Neenah mills to Jones and Yale; 9th. Water power account, No. 1; 10th. Saw mill, No. 1; 11th. Grist mill account, No. 1; 12th. Interest account on expenditures and receipts; 13th. Neenah mill account, No. 1; 14th. Water power, No. 2; 15th. Grist mills, No. 2; 16th. Saw mill, No. 2; 17th. Interest account on expenditures and receipts; 18th. Neenah mills account, No. 2; 19th. Water power, No. 3; 20th. Lock account, No. 1; 21st. Saw mill account, No. 3; 22d. Grist mill account, No. 3; 23d. Interest account of expenditures and receipts; 24th. Neenah mills, No. 3; 25th. Water power account, No. 4; 26th. Lock account, No. 2; 27th. Saw mill, No. 4; 28th. Grist mill, No. 4; 29th. Interest account on expenditures and receipts; 30th. Neenah mills,

No. 4; 31st. Lock account, No. 3; 32d. Water power, No. 5; 33d. Saw mill, No. 5; 34th. Grist mill, No. 5; 35th. Interest account of expenditures and receipts; 36th. Neenah mills account, No. 5; 37th. Water power account, No. 6; 38th. Lock account, No. 4; 39th. Guard lock account; 40th. Saw mill account, No. 6; 41st. Grist mill account, No. 6; 42d. Interest account on expenditures and receipts; 43d. Neenah mill, No. 6; 44th. Water power, No. 7; 45th. Saw mill, No. 7; 46th. Grist mill, No. 7; 47th. Interest account of expenditures and receipts; 48th. Neenah mills account, No. 7; 49th. Water power account, No. 8; 50th. Lock account, No. 5; 51st. Saw mill account, No. 8; 52d. Interest account on expenditures and receipts; 53d. Grist mill, No. 8; 54th. Neenah mills account, No. 8; 55th. Saw mill account, No. 9; 56th. Water power account, No. 9; 57th. Lock account, No. 6; 58th. Grist mills, No. 9; 59th. Neenah mill, No. 9; 60th. Interest account of expenditures and receipts; 61st. Water power, No. 10; 62d. Saw mill, No. 10; 63d. Interest account on expenditures and receipts; 64th. Neenah mill, No. 10; 65th. Water power account, No. 11; 66th. Interest of expenditures and receipts; 67th. Neenah mill, No. 11; 68th. Water power account; 69th. Saw mill, No. 12; 70th. Interest account of expenditures and receipts; 71st. Neenah mills account; 72d. Neenah mills account; and 73d. Account of time on Neenah mill property from April 17th, to November 8th, 1849. These accounts occupy 40 double columned pages of the printed case. Some of which are footed up and some are not.

The plaintiff objected to all evidence proving these accounts, and to the accounts themselves, because they were not such as were required by the decree of the court, and they contained items of charges which are irrelevant, and not contemplated by said decree and order to charge the plaintiff. The testimony of the witnesses occupies 44 pages of the case closely printed. The report itself, without the testimony, is as follows:

*To the Honorable* CHARLES H. LARRABEE, *Judge of the third Judicial Circuit for the State of Wisconsin, in the County of Marquette, in Chancery sitting:*

The undersigned, Satterlee Clark, a court commissioner of said court, to whom said cause was referred as by copy of the order of reference filed herewith will more fully appear, begs leave most respectfully to report, that on the 22d day of June A. D. 1855, I carefully prepared four copies of the order of reference in this cause, and four notices, which I indorsed and directed one to each, Harrison Reed, complainant, E. L. Buttrick, Esq., solicitor for complainant, Loyal H. Jones and E. W. Drury, defendants, all of which I deposited in the post office at Green Lake, postage paid, to be forwarded as directed ; said notices were returnable at Neenah, Wis., on the 11th day of July A. D. 1855, at 9 o'clock, A. M., of said day.

On the 11th day of July, A. D. 1855, the parties all appeared, and I proceeded to take the proofs set forth in said order of reference, adjourning from time to time, as occasion seemed to require it.

The complainant, Harrison Reed, claimed to have expended in improvements on said property the sum of $300, which is admitted in the answer of Harvey Jones, and said he had no other account for expenditures.

The defendants here offered an account which purports to be an account of all the disbursements and expenditures, as well as all the rents, issues and profits, and proceeds arising from the sales of lots, showing and claiming a balance of expenditures, over the receipts of $50,136 70, as by reference to said account in 16 parcels, numbered from 1 to 16 inclusive, and filed herewith will more fully appear. Said account is sworn to by Loyal H. Jones, one of the defendants, and is supported by the testimony of Loyal H. Jones and Samuel Roberts, book-keeper and clerk of defendants, also by several witnesses.

who testified as to certain of the expenditures, as will more fully appear by the testimony of said witnesses filed herewith; and also by 1,568 vouchers for money paid out as charged in said account.

The decree of the Supreme Court and the order of reference require, 1st. That the commissioner shall take proofs as to the amount of necessary improvements made upon the lands described in the contract between Harvey Jones and Harrison Reed, bearing date the 23d day of July, 1846, from said date till the filing the bill of complaint, by whom the same were made, the expenses and costs thereof, with the dates and amounts of all payments for such necessary improvements made by the parties respectively, &c. 2d. That he shall take proofs as to the amount expended in making such improvements upon said property as were necessary and required for the due use and preservation thereof at any time since the filing of the bill of complaint herein, &c. 3d. That he take proofs as to the amounts received by either of the parties, &c.

The account on file is one general account of all the expenditures and disbursements, and of all the receipts; being an account kept by defendants with the Neenah mills property, being the property in dispute, and contains each item with the date and amount, and to attempt to separate them under different heads, would involve the labor of a great length of time.

Your commissioner therefore reports that it appears from the testimony, that there was upon the said property on the 23d day of July, 1846, one old saw mill, one grist mill, a wing dam and race, and seven or eight old buildings all out of repair.

That there was expended by Harrison Reed, as admitted by Harvey Jones, $300; interest on this sum to March 1st, 1856, $326 75, making a total to be credited to Harrison Reed for expenditures $626 75, but it does not appear what

the character of the improvements made by Harrison Reed were.

It also appears from the testimony that since the 23d day July, 1846, the defendants repaired the old grist mill and saw mill, have widened and deepened the race, built the new dam across the river, (copy of charter filed by consent,) have built a new saw mill, cleared the town plat and surveyed it into blocks and lots, cleared the channel of the river to permit steamboats to enter from Lake Winnebago, built a lift lock, a bulk head and guard lock, constructed the canal, made repairs from time to time and enlarged the branch race to new saw mill; and also that the defendants have run the mills themselves, except for a short space of time.

The account on file shows every item of expense incurred in making the repairs and improvements above set forth, as well as all the expenses of running the mills, including logs for saw mill, wheat and other grain for grist mill, and *wages* for men engaged in running said mills; and it further shows the rents, issues and profits of the same by credits for lumber and flour sold.

It is contended by the complainant that the proper course for the commissioner to ascertain the rents, issues and profits, is to find what the use of the mills would be reasonably worth per annum, and charge defendants with the rent for the whole time; the commissioner thinks differently, and that under the decree of the Supreme Court, he is to report the amount of rents, issues and profits *received* by either of the parties to date, &c.

Their being no evidence to the contrary, the commissioner can only conclude that the account on file so far as the items are concerned, is clearly proved, that the necessity for making said improvements is not only proved by the testimony on file, but is obviously to carry out the original intention of the parties.

Owing to the importance of this suit and the very large amount of property in dispute, it being stipulated to be worth from $100,000 to $150,000, independent of the improvements, the commissioner has carefully compared the account on file with the books, and is unable to discover any substantial difference; though there are some items for services not charged at the time the services were rendered, but which is explained by the testimony.

In making up said balance of $50,136 70, above set forth, the commissioner discovers the defendants have computed the interest on each item of expenditure from the date of the payment to the end of the six months, then computed the interest on the last semi-annual balance and added all together to make another balance. The commissioner has thought proper to pursue a different course. He thinks under the contract, that a balance should be struck once in six months, and that in computing the interest it is proper to make semi-annual rests, and the monies received from rents, issues and profits of said property, shall from time to time, once in six months, first be applied to extinguish the interest then due, and the excess to reduce the principal.

The account following will show the conclusions arrived at by the commissioner from the testimony:

To balance of expenditures over receipts due defendants by
Neenah Mills, ..................................................... $48,840 36

To make this sum there is charged in the general account—

To paid Harvey Jones for his services, ...............$1,933 34
To paid Loyal H. Jones, for his services from Nov. 8,
1850 to March 1, 1856, ............................... 7,600 00
To paid taxes on said property, ......................... 3,414 31
To paid attorney's fees, witness fees, costs and expenses
in several law suits against Neenah Mills, .......... 1,502 90
To whole amount of interest allowed, computed as above
stated from the date of said contract to March 1st,
1856, ................................................... 33,621 93

The other items of said account appear to be for constructing improvements and making repairs on said property, and expenses incident to the running the mills, purchasing stock, &c.

### STATEMENT.

| | | |
|---|---|---|
| Bal. of expenditures over receipts, | | $48,840 36 |
| Amount due complainant for expenditures on said property, $300 00, int. 326 75— | | 626 75 |
| | | $48,222 61 |
| One fourth of this sum is, | $12,055 65 | |
| To which add purchase money, | 1,250 00 | |
| Interest on the same, | 236 30—13,541 95 | |
| From which deduct the amount of Judgment record and interest, (see transcript) | | 198 40 |
| Amount to charge complainant, | | 13,343 55 |

The commissioner is not clear under the decree whether the complainant is entitled to credit in the account for the proceeds arising from sales since the filing of the bill, but concludes not to deduct it from said account.

The complainant therefore stands credited on the account with the proceeds arising from all sales since the filing the bill, $29,575 45, and in stating the balance, ¼ that sum, $7,593 86.

To arrive at the foregoing conclusions, the commissioner received the account books on file, supported by the testimony of Loyal H. Jones and Samuel Roberts, as *prima facia* evidence in proof of the charges therein contained, except such as were not made at or about the time the services were performed, and which were proved by other testimony. The commissioner also received and used all the testimony of all the witnesses, called by either party, that was relevant.

Commissioner also received and used all the vouchers as far as they go to corroborate the items of account for which they were given, the whole number being 1568, and 434

proved by L. H. Jones, and 984 by Sam'l Roberts, but would receive and use them without any proof, conceiving that to be the rule in long standing accounts.

The commissioner in regulating the pleadings before him has been governed by the Supreme Court Rules, so far as the same are applicable. He also used a printed copy of the case on file herewith, one mill dam charter and one map filed by consent of parties; and one transcript of judgment against complainant for trespass upon said property.

The commissioner certifies that in taking said testimony all the witnesses were sworn to speak the truth, the whole truth and nothing but the truth, and the testimony was all taken down by the commissioner or some person in his presence, and was signed by the witnesses severally in the presence of the commissioner after the same had been read by the witness or to the witness by the commissioner. All of which is respectfully submitted.

Dated Marquette, March 24th. 1856.

SAT. CLARK, Court Commissioner.

### EXCEPTIONS TO COMMISSIONER'S REPORT.

And now comes the said complainant by E. L. Buttrick, his solicitor, and files the following exceptions to the report of the commissioner, Satterlee Clark, Esq., to whom the matter of taking the accounts in this cause was referred by the order of this court; and—

1. As to so much of said report, as allows the admission of the accounts on file in this cause, numbered from 1 to 16 inclusive, or any portion of them as evidence in any manner to charge the complainant, we except, because he says: 1st. Said accounts are not such as are required by the order and decree of the court under which said commissioner acted, 2d. They contain charges for money expended for purposes of private speculation in which complainant had no voice

and to which he did not assent. 3d. They contain charges for large amounts of money expended and materials furnished by Loyal H. Jones and Erastus W. Drury, *as administrators of the estate of Harvey Jones,* without authority of law, and without the consent of complainant. 4th. No part of said accounts as charged are proved by legal and competent evidence. Those witnesses, called by defendant, who testified to said accounts, did so in a general manner, and not from actual knowledge of particular items. Loyal H. Jones is a party defendant, and his testimony having a tendency to discharge himself and charge complainant, is not competent to prove said accounts. The testimony of Samuel Roberts as to said accounts, is vague, uncertain, contradictory and insufficient.

2. Complainant excepts to so much of said report as allows the introduction of the 1568 vouchers alluded to therein as evidence to charge complainant or corroborate said accounts: because he says they are receipts given by third persons to defendant. 1st. They do not show upon their face for what they were given, nor does it appear from other competent evidence. 2d. They are secondary evidence.

3. Complainant excepts to said report or so much thereof as allows the admission of said accounts; "so far as the items thereof are concerned as clearly proved;" because there is no evidence to the contrary.

4. He excepts to so much of said report as allows the introduction of the books of account on file numbered from 1 to 8 inclusive, as evidence to charge complainant or corroborate said accounts; because he says said books do not purport to contain accounts between Harvey Jones and complainant or the administrators and complainant, but are books of account between the defendants and third persons, and are admitted solely upon the oath prescribed by statute in cases of accounts between parties, viz:—of defendant Jones and his book keeper Roberts.

5th. Complainant excepts to so much of said report as allows a balance of $48,849 36 due the defendants by "Neenah Mills" or for expenditures upon the property.

6. Complainant excepts to so much of said report as allows to Harvey Jones the sum of $1,933 34 for his services—because he says that Harvey Jones was entitled to no compensation whatever.

7. Complainant excepts to so much of said report as allows to Loyal H. Jones the sum of $7,600 for services from November 8th, 1849, to March 6th, 1856—because he says said Jones acted only as administrator of Harvey Jones' estate, and if entitled to any pay, said estate and not complainant must pay him.

8. Complainant excepts to so much of said report as allows the sum of $3,413 31 for taxes on said property—because he says no legal proof was produced that any such amount of taxes was paid.

9. Complainant excepts to so much of said report as allows the sum of $1,502 90 for witness fees, costs, &c., in several law suits against Neenah Mills—because these is no legal evidence of any such expenditures, and if there were, it is not a legitimate matter of charge.

10. Complainant excepts to so much of said report as allows the sum of $33,621 93 interest—because there is no legal and competent proof of any expenditures for improvements or repairs which would warrant that amount of interest.

11. Complainant excepts to so much of said report as allows a balance of $13,343 55 against said complainant as his share of the expenditures upon said property.

12. Complainant excepts to that part of said report which credits to the expense account the sum of $29,575 45 for lots and property sold since the filing of the bill in this cause.

13. Complainant excepts to the entire report, item by item and paragraph by paragraph—because he says said report is

not in accordance with the order and decree of this court, and in making it up the commissioner arrives at his conclusions without evidence.

14. Because said report brings a balance against the complainant, whereas by the evidence taken before said commissioner and filed with his report he should have found a balance in complainant's favor.

15. Because said report does not show what part of the testimony taken by the commissioner was admitted as relevant and what rejected.

16. Because said report does not show the amount of debts and the amount of credits allowed by the commissioner as proved.

On these exceptions the circuit court made the following order:

This cause coming on to be heard upon the exceptions to the commissioners report, and upon hearing E. L. Buttrick, Esq., in favor of said exceptions, and E. W. Drury, Esq., contra, it is ordered that said exceptions numbered six, seven and ten, be and the same are hereby sustained; and that the exceptions numbered one, two, three, four, five, eight, nine, eleven, twelve, thirteen, fourteen, fifteen and sixteen, be and the same are hereby overruled; and that the complainant have and recover his costs for the exceptions so sustained, and that the defendants have and recover their costs for the exceptions so overruled, to be taxed.

By the Court,       CHARLES H. LARRABEE.
September 16, 1856.

After which the circuit court made and entered the following decree:

This cause coming on to be heard upon the report of Satterlee Clark, Esq., the commissioner appointed herein to take the account of the parties, and upon the exceptions filed there-

to, and upon the reading the proofs and hearing the argument of counsel; it is ordered, adjudged and decreed, that the said complainant pay into this court for the benefit of the legal representatives of the said Harvey Jones, the sum of $9,172 01, within one year from the date of this decree, with interest thereon at twelve *per centum per annum* up to the date of payment.

And it is further ordered, adjudged and decreed, that upon said payment the undivided one-fourth part of all the right, title and interest which the said Harvey Jones had in and to all the lands described in the contract, &c., in the pleadings of the date of July 23d, 1846, at the date thereof be and the same is hereby vested in the said Harrison Reed, his heirs and assigns, except so much thereof as has been sold by the said Harvey Jones or his legal representatives, between the 23d day of July, 1846, and the 22d day of March, 1856, the date of the closing of the said proof by the said commissioner, and which has been taken into account in ascertaining the said sum of money which the said complainant is decreed to pay.

It is further ordered, adjudged and decreed, that the said complainant have and recover of and from the said defendants the sum of             as his costs by him about this suit expended, and that he have execution thereon, or in default of payment he have leave to apply to this court for an order enforcing their payment.

By the Court,        CHARLES H. LARRABEE.
September 17, 1856.

NOTE.—Appended hereto are schedules of the separate classes of accounts, showing the manner of arriving at the sum fixed by this decree to be paid by Harrison Reed, marked.

CHARLES H. LARRABEE.

Reed vs. Jones and Drury.

STATEMENT REQUIRED BY THE DECREE OF SUPREME COURT.

1. The amount of necessary improvements on the lands from the 23d day of July, 1846, to the 17th day of April, 1849, ...... $16,183 66

2. The amount of improvement required for the due use and preservation thereof, since the 17th day of April, 1849, ......... 45,943 71

3. The amount received by defendants from the sale of lots previous to the filing the bill, April 14th, 1849, ............... 1,858 75

4. The rents, issues and profits (including proceeds arising from sales), received by defendants, .............................. 51,426 87

5. The whole amount of interest upon the expenditures by defendants, ........................................................... 48,784 82

6. The whole amount of interest charged defendants upon receipts, ....................................................... 27,412 13

7. The whole amount allowed defendants for all expenditures to the time of closing the taking proofs, ..................... 62,127 37

8. Interest on the above last sum, ................................ 48,874 82

9. The whole amount for principal and interest, ................. 111,002 19

10. The whole amount of rents, issues, profits, &c.,....$51,426 87

11. Interest on rents, &c.,......................... . 27,417 13— 78,639 00

12. Balance of expenditures over receipts, ....................... 32,163 19

13. Amount allowed complainant for expenditures, principal and interest, ................................................... 626 75

$31,536 44

14. One-fourth to the complainant, ............... 7,884 11

15. Amount of purchase money and interest, ........ 1,486 30

16. Whole amount to charge complainant, .................... $9,370 41

17. Amount to be deducted, paid by complainant on transcript of judgment for trespass, by stipulation, .................. 198 40

18. Amount for complainant to pay, ........................ $9,172 01

In ascertaining this sum the court disallowed the sum of $1,933 34 for the services of Harvey Jones, and the sum of $7,600 for the services of Loyal H. Jones, and the interest on both sums allowed in commissioner's report.

In computing the interest, annual rests were made, and the interest computed on both expenditures and receipts, at 12

*per centum per annum,* and the balance struck at the time of closing.

From this decree Reed took an appeal to the supreme court.

*E. L. Buttrick,* for the appellant.

This cause was brought into this court on appeal from the final decree of the circuit court of Marquette county, which purports to be based upon the report of Satterlee Clark, Esq., to whom the case was referred by the court, for the purpose of ascertaining and reporting to the court the following facts:

1st. To ascertain the necessary improvements made upon the property described in the pleadings, from July, 23d, 1846, to April 14th, 1849, by whom made, and the costs thereof, &c. 2d. The amount expended in making such improvements upon the property as were necessary and required for the *due use and preservation* thereof, at any time since the filing of the bill of complaint, with the dates of such expenditures, and by whom paid. 3d. That he take proofs as to the amounts received from either of the parties from the sales of any portions of said property *previous* to the filing of the bill of complaint. 4th. The rents, issues and profits, derived by either and all the parties to this cause from the property, from the 23d day of July, 1846, until the time of taking such proofs, the dates at which such rents, issues and profits were received, and by which of the parties. 5th. That the commissioner report to the court all the proofs by him taken, as to the necessity and character of the improvements, the costs thereof, by whom paid, and the dates of payment, as well as all proofs touching the receipts of rents, issues and profits, and proceeds of sale.

The defendants are the accounting parties, and for the purpose of charging the complainants, introduce their schedules of accounts and seek to substantiate the same by their books

of account, verified by the oath of defendant Jones, and of Samuel Roberts, his book-keeper.

1. The books of account are not evidence, because: 1st. The accounts therein charged are not between the parties to this suit. Whatever be the nature of the subject, the transaction, to be susceptible of this kind of proof, must have been directly between the original debtor and creditor; books cannot be admitted to establish a collateral fact. 12 Met., 491; *Mifflin vs. Bingham*, 1 Dall., 276; *Kerr vs. Love* 1 Wash., 172; *Dras vs. Darby*, 1 Nott & McC., 436; *Poulteny vs. Ross*, 1 Dall., 238; *Woodes vs. Dennett*, 12 N. H., 510 *Cummings vs. Nichols*, 13 N. H., 420; *Eastman vs. Moulton*, 3 N. H., 156; 23d Maine, 475; 14th Maine, 208; 4 Met., 221. Books are no evidence of payment to third persons, or cash paid to an amount exceeding $5 00. Rev. Stat., p. 527. 2d. The accounts are not authenticated by the receipts introduced by the defendants; they are subject to the same objections. Cow. & Hill's Notes, p. 558; note 432 and cases cited; 1 Phillips on Ev., p. 229, 230; Greenleaf's Ev., p. 175, *et seq;* 3 Wen., 397. 3d. The accounts are not substantiated by the testimony of any witnesses competent to testify. Complainant claims, therefore, that there is no evidence derived from the accounts or the receipts upon which the court can base a decree.

2. It appears from the testimony that at the time of the execution of the contract between Jones & Reed, to wit:—July 23, 1846, there was upon the property a saw mill, grist mill, a race, a wing dam and seven or eight log houses, all out of repair. At the time of the filing of the bill in this cause, the mills had been repaired, the race widened and deepened, a new saw mill erected and a new dam built, and Harvey Jones, in his answer claims that his expenditures, at this time, to wit:—April, 1849, had amounted to only about $15,000, while his receipts from the sales of real estate and the rents,

issues and profits of the property amounted to $5,882 20, leaving a net balance against the property of between nine and ten thousand dollars.   The complainant claims that this is the maximum of the expenditures from July 23d, 1846, to the filing of the bill in this cause, beyond which the defendants should not be allowed to go in their proof.   But complainant insists that defendants have not proved even this amount.   They are bound by whatever they admit against themselves, but must prove whatever they seek to charge complainant with.

3. Complainant is bound to contribute his proportion for such expenditures only as were *necessary*.   1st. The dam built by Harvey Jones was unnecessary.   It was improperly constructed and became thereby a source of ruinous expenditure.   If a new dam were necessary at all, then complainant should pay his proportion only of what a *good, permanent dam would cost*.   2d. The new saw mill was a private speculation, built without the consent of the complainant, and he is not chargeable therefor.   Tenants in common cannot erect buildings on joint or common property, and charge the other tenants with their share of the expense.   *Mumford vs. Brown*, 6 Cow., 475; *Cust vs. Jacks*, 3 Watts, 238; 5 Cow., 588; 2 Rich. Eq., 317; 1 John. Ch., 384; 4 Paige, 336; 20 John., 28; 1 John. Ch., 26.   3d. All improvements and expenditures upon the joint property, made since the filing of the bill have been made "*pendente lite.*"   The complainant charged in his bill at the outset the intention of the defendant, H. Jones, to make such expenditures, and prayed an injunction to restrain him.   *Murray vs. Finster*, 2 John. C., 155; *Heatley vs. Finster,* 2 John. C., 157; *Murray vs. Lytburn*, 2 John. C., 441; *Sears vs. Hyer*, 1 Paige, 483; *Hosack vs. Rogers*, 9 Paige, 461; *Brown vs. Wallace*, 2 Bland, 585; 1 Dan. Ch. P., 336.

4. In November, 1849, and about six months after the filing of the bill, Harvey Jones died, and it appears from the proofs

that since his death the property has been managed and controlled by Loyal H. Jones and Erastus W. Drury, solely in the capacity of administrators, and these defendants, as administrators, seek to charge complainant for expensive improvements which they had no authority in law to make. 1st. Administrators have no control over the real estate of the intestate, except to take possession thereof, collect and receive. the rents, issues and profits therefor, and keep the same in good tenantable repair. R. S., chap. 69, sec. 7. They have no power to sell the same except by order of the Probate Court, and only for the purpose of paying the *debts of the intestate.* An administrator cannot create a debt against the estate of the deceased. *Davis vs. French,* 2 App., 21; *Lovell vs. Field,* 5 Verm., 218. He cannot bind the estate of the intestate by his acts, though he seeks in express terms to do so 8 Mass., 162; 6 Mass., 58. All expenditures made by the administrators, except such as are authorized by chap. 69, sec. 7, R. S., have been made in their own wrong and without authority of law. The indebtedness which has accrued is the indebtedness of the *administrators,* and not of the estate. Shall the complainant be compelled to pay debts for which the defendants, Jones & Drury, are individually liable, and which are and can be no lien upon or charge against the property in dispute? If the administrators have used the property for their own emolument, they have acted without authority. 5 John., 383.

5. The decree is further erroneous in that it takes into account all the sales of real estate made *since* the filing of the bill, as well as those made before, and gives the complainant an interest in that portion only which remained unsold at the time of taking the account. The decree of this court is ambiguous, inasmuch as it provides for taking *an account of sales to the time of filing the bill,* and at the same time orders that the decree of the circuit court shall vest in complainant

the undivided fourth part of the interest which Harvey Jones had in the premises, " described in the contract of the date of July 23d, 1846, *at the date thereof.*"

6. The administrators, so far as the complainant is concerned, are in the position of trustees, and are therefore bound to account strictly, and if they fail to do so, complainant is entitled to what the use of the premises is reasonably worth. *Van Horn vs. Fonda,* 3 John. Ch., 388 ; *Green vs. Winter,* 1 John. Ch., 26 ; *Hart vs. Ten Eycke,* 2 John. Ch., 62 ; 3 id., 614 ; 4 id., 281 ; 8 id., 441 ; 1 Paige, 13 ; id. 188 ; *Coffray vs. Darley,* 6 Vesey, 488 ; 11 id., 91 ; 1 id., 452, (note.)

The administrators have taken the responsibility of running the mills themselves. Must complainant be bound by their management ? If his interests in the rents are to be controlled by their profits, why is he not equally liable for their losses ?

As to rents, issues and profits, It appears from the testimony that the grist mill did a good business. Jones refused to rent it for $1,000 per annum to Jewell because he thought it not enough. Jones wanted $1200 per annum.

The mill in 1846 and 1847 was out of repair, and as witnesses say, did little business, and yet from July '46 to April '49, it earned $1, 649. Davis swears that the average rent of the mill was worth $400 to 500 per annum, and yet it has earned $1,500 the last year. Roberts swears that for the only year he footed up the balance in favor of the grist mill, it was $1,700 ; he kept an account of the nett profits for 5 or 7 weeks, and for that time they were $700 ; Northrup testifies that the rent of the old grist mill was worth $1500 per annum ; for the old saw mill, $700 ; others say 200 ; the average would be 450 ; for the new saw mill $1200 ; the mill house has been worth $48 dollars per annum since 1847 ; the two point houses, $72 per annum for the same time ; the 5 log houses $25 each ; water rent $30 per annum for 5 years ; upper part

of saw mill $30 per annum. Complainant, therefore claims that he should be credited with one-quarter of the following amounts:

| | |
|---|---:|
| Grist Mill, 9¾ years, at $1,500 per annum | $14,625 00 |
| Interest on $1,500 annually, for 9¾ years, 12 per cent | 8,376 00 |
| Old Saw Mill, 9¾ years, at $450 | 4,387 00 |
| Interest as above | 2,648 00 |
| 5 log houses, at $125, same time | 1,218 75 |
| Interest as above | 775 25 |
| Two point houses, at $72 each | 702 00 |
| Interest as above | 452 70 |
| Mill house, 8 years, at $48 | 384 00 |
| Interest as above | 197 00 |
| New saw mill, 7 years, at $1,200 per annum | 8,400 00 |
| Interest annually | 4,032 00 |
| Sales of lots to time of filing bill | 1,858 75 |
| Interest as above | 1,561 00 |
| Rent of upper part of new saw mill | 60 00 |
| Interest since 1850 | 44 64 |
| Water rent, $30 per annum, 5 years | 150 00 |
| Interest annually | 54 50 |

$50,815 72

| | | |
|---|---:|---:|
| One-fourth of this amount is | $12,703 93 | |
| To this add amount of judgment against complainant | 124 99 | |
| Interest | 74 40 | |

$12,902 33

We think the expenditures sworn to by Yale, too much, to wit: $3,000; but taking his testimony and Northrup's together, which is $1,800, and averaging the same, it amounts to ..... $2,400 00

Interest 9 years ..... 2,592 00

Complainant claims that he is not liable for a new dam at all; but if the court should think differently, then he claims that all he should pay is what a good dam should cost, and not more at the outside than ..... 3,000 00

Interest on this amount from 1849 ..... 2,520 00

Total ..... $10,512 00

| | | |
|---|---|---|
| One-fourth of this is........................................ | $2,628 00 | |
| To this add purchase money............................. | 1,250 00 | |
| Interest at 7 per cent., 2 years and 10 months......... | 257 91 | |
| Amount with which complainant should be charged... | $4,135 91 | |
| Amount to be credited to Reed.............................. | | $12,902 33 |
| Amount to be charged to Reed............................... | | 4,135 91 |
| Balance due Reed from defendants...................... | | $8,766 42 |

*E. W. Drury and E. G. Ryan,* for the respondents, filed the following argument.

The counsel for complainant opened his argument by informing the court that Reed had lived several years at Neenah in a shanty, &c., &c., and by stating several other things which do not appear in the case, and it may not be improper for the defendants to call the attention of the court to a brief synopsis of the real history of this case, as it appears by the statements of the bill and answer, and papers on file. This case shows that sometime in June, 1846, the complainant, Reed, met Harvey Jones (the defendant deceased) at Prairieville, Waukesha county, Wisconsin. Reed had made a bid for certain lands, offered for sale by the War Department, described in the bill as tracts 5, 10, 11, and failing to pay the money, had forfeited his bid, and the property was re-advertised for sale by the War Department. Jones was a man of wealth, as the bill states, and then resided at Gloversville, New York, and was the cashier of the bank at that place, and was seeking to make an investment in Wisconsin. Reed represented to Jones that he could get these lands, notwithstanding his forfeited bid, and Jones was induced to advance the money and pay for all three tracts and to give Reed two of them for his claim on them. Reed got the lands of the War Department, and Jones paid $5,000 for them, and gave two tracts to Reed, to wit: tract 5 and 11, and took tract 10 himself, by amicable arrangement with complainant.

Tract 10 was designed for a town site, and embraced

the water power. To secure the influence of Reed and "influential friends," Jones further gave Reed the contract, dated Gloversville, July 23d, 1846, with a view to secure Reed's influence and aid in building up a town at Neenah, providing that Reed was to have one-quarter of tract 10 at cost, to-wit: for $1,250, if he paid in one year, and paid his share of the "improvements." Reed failed to perform this contract. All inducements that Jones had to give Reed ¼ at cost, to-wit: that Reed should pay for his "proportion of the improvements," and pay the $1,250, were entirely lost to Jones, by the non-compliance and non-performance of Reed. Jones might just as well have been alone in building up a town, Jones was compelled to sell his property east, and went on with all his energy and capital in building up a town, and succeeded. The property became valuable through Jones' efforts alone, unaided by Reed. Nay! as the proof shows in spite of Reed's opposition.

The case shows that Reed gave up the idea of paying the $1250, and sold out all his claim to one Charles Yale, May 15, 1847. Yale agreed to pay Jones said $1250, and give Reed ⅛, or pay the damage. Yale did not pay Jones said $1250, and failing to perform said contract of Reed to Jones, as the assignee of Reed; Yale being possessed of all the rights of Reed, did, nearly two years afterward, release all claims to said tract 10, by a quit claim deed to Jones.

Tract 10 embraces the property in dispute, and in 1849, by Jones' efforts, had risen to the value of $50,000; and the complainant had not assisted in building up or enhancing the value of the property, but opposed it, and had been trying to get up a town at Menasha, which had become a rival village, and in 1847 or 1848, Reed laid out a village himself, in opposition to Jones' Plat, on the same side of the river, and on the property Jones had paid for and given to Reed. In 1849, when this property had become worth $50,000, Reed brings

his bill to recover ¼ of this property, and makes his tender of the $1250 and interest, but makes no tender for the improvements Jones had made, according to the Gloversville contract, which improvements had amounted to about $18,000.   The defendant believed these proceedings were commenced by Reed to " vex and annoy" him, and to embarrass the title to said property, so as to build up  Menasha at the expense of Neenah.

It is curious to notice the various changes of Reed's claim. 1. The bill was bought to enforce an *unwritten* contract and set aside the contract as *reduced to writing* at Gloversville. The unwritten contract, it was alleged, was made at Prairieville, and the bill brought to enforce it by varying the written one according to the alleged terms of the prior verbal one. The whole bill was based upon this ground and no other. The court, Judge Stowe, the lamented Chief Justice of this Court, told them they could not expect to do this.   An injunction was granted by Judge Jackson, who held the court in Winnebago county, to stop  the running of all the mills, and stop the sale of this property, and of course the growth of the town, requiring Reed to give a bond with only $500 penalty. Judge Stowe held a special chancery term and dissolved the injunction on the ground that the bill showed that Jones was able to respond in damages, and further, that if a sale of lots were stopped, it would stop the growth of the town and injure both parties; and Judge Stowe at that time suggested, that Reed could not hope to recover ¼, as he had parted with his claim for ¼ to Yale; and could of course only claim ⅛, and could not claim *that* of Jones unless he could show that Jones had *colluded with Yale* in a *fraudulent* transaction against Reed, so as to compel Jones to fulfil Yale's agreement with Reed for one-eighth.

And then, 2.  Reed immediately amended his bill and prayed for ⅛, and asked that Jones might carry out Yale's

Reed vs. Jones and Drury.

contract. Jones died Nov. 8, 1849, leaving three infant children aged 8, 10 and 12 years, and no widow. T. O. Howe, Esq., one of the solicitors in the case, was elected judge, and the case was sent to Marquette. At Marquette, the Hon. A. D. Smith being solicitor in the case, on the suggestion of Judge Larrabee, that Reed might as well claim ¼, the bill was thirdly amended again and ¼ claimed by Reed instead of ⅛. And Judge Larrabee did afterwards actually decree that Reed should have ¼ *without paying anything*, either for improvements amounting to 18,325 dollars, or for the 1,250 dollars purchase money. It does not seem possible that such a decree could have been made, but the case shows it to have been so; and further shows that this court reversed said decree, but sustained it so far as to give Reed ¼ of said property; and sent the case back to the judge of the 3d circuit to take an account of the sales, repairs, improvements, rents, issues and profits.

And now the complainant's solicitor in his brief and argument asks this court to set aside all the accounting that has been taken, and give Reed that entire property which he claims, without paying the 1,250 dollars, or paying anything for the improvements, worth 50 or 60,000 dollars, and pay Reed $8,766 42 cents. Is this law, equity or common sense?

The accounting required by the decree of this court has been taken before the commissioner to whom it was referred by the circuit court, and he has reported that there was due from said complainant the sum of $13,343 55. This report was founded upon the accounts which the administrators were able to produce for expenditures on said property, and on proofs taken by said commissioner; but it is not probable that the present defendants could have found all the items which should properly have been charged for the innumerable expenses to which Jones and his estate were subjected in their efforts to build up a new town; and there can be no

doubt but that many thousands of dollars spent to obtain legislation and to secure influence, in which Reed ought to have shared, have not been found and never can be produced or proved. While on the contrary, if a single charge of one dime had been made, that was not applied to the property, Reed could have shown it. It is to be observed that of all the 1568 vouchers offered by the defendants, the complainant has not been able to show that a single one of them is unjust. If they had been false and not given for expenses properly chargeable upon said property, could the complainant not have found *one man* out of the 1568 to deny the truth of said vouchers?

The counsel for complainant asked in his argument why the defendants did not enquire of the witnesses, Roberts, Asa Jones, Hiram Wheeler, Sherry Proctor, and others, as to the correctness of their individual accouts which appear on the books? Might we not ask why the complainant did not ask them as to the correctness of said accounts, if he had any doubt on the subject? Proctor was on the stand the complainant's witness. If there was any doubt of the justness of Proctor's account why did not complainant question Proctor, and why did he not question the other witnesses whose accounts are on the books? These vouchers were produced and offered only as a *prima facia* evidence of the facts and to sustain the charges on the books make directly against said property, and 984 of them are proved by the oath of Samuel Roberts, who swears that he was knowing to the transactions. The defendants claim that the report of the commissioner does not allow enough against the complainant.

The administrators in making up the accounts followed the provisions of the Gloversville contract, that each party was to pay his share for the improvements, "*at the time* the improvements are thought necessary," and draw interest on

such advances at the rate of 12 *per cent.* and the administrators cast interest *from the time* such advances were made, as specified in said contract, and made the balance against said property $50,136 70.    But Clark, the commissioner, did not allow interest on said advances till after the settlement *at the end of six months* provided for in said Gloversville contract, and he finds a balance of only $48,349 36, one-fourth of which he has reported as due from said complainant.    Said commissioner in his report, and said circuit court in their final decree, allow to said complainant for expenditures on said property the sum of $300, and interest $326 75, making $626 75, "as admitted by Harvey Jones," and the admission by Harvey Jones is the only evidence of said $626 75. Now, if the court will turn to the admission of Harvey Jones in his answer, and it is found no where else, it will be seen that Jones says that Reed had advanced only " 108 dollars and some cents," and says that he had an offset to that sum, and says that the sum of 300 dollars allowed to Reed included " *charges for personal services !*"

In the commisioner's report of the testimony the commissioner states as follows :  " The complainant here said that he had no account for expenditures except the one embodied in the bill of complaint filed in this case, said bill does not contain the items of account, but the aggregate amount expended while said complainant remained in possession of said property.    *The items of which account said complainant will furnish before the close of the examination.*"    Now, has he furnished such items?   Not one!    Then why has the commissioner, or said court, allowed such a charge of $626 75 against the defendants.    If they allowed Reed's claim only three-fourths should be paid by defendants.    But it is argued that none of it should be allowed without Reed's furnishing the items !    And it seems that while Reed was allowed to charge for his " personal services " upon said

property, the said court entirely disallowed the sum of $1,933 34, which the commissioneer found due from the complainant for the personal services and expenses of Harvey Jones in his lifetime, while erecting all these large improvements and travelling to procure mill machinery and other material purchased in Milwaukee, Chicago and New York, and attending to these improvements from 1846 to 1849. It appears also that the charge of L. H. Jones for his services of the sum of $7,600, which was allowed by the commissioner, was disallowed by said court, and it must be recollected that for this service the infant heirs of this property must pay.

The commissioner finds due from the complainant the sum of $13,343 55; one-fourth of the above two items disallowed by the court is $2,383 33, leaving due from complainant $10,960 22.

The complainant's counsel assumes that the law will not admit of any charge by one tenant in common against another for services. That is so as a general principle. But it is equally within the general principle that one tenant in common cannot charge another for expenditures for improvement or care of the common estate. And the mistake made by the complainant's counsel in the application of the rule is in dealing with the complainant and H. Jones as mere tenants in common. Admitting them to have been, for some purposes, tenants in common, the contract of July 23d, 1846, puts them, in several respects, in a relation essentially different from the relation established by a mere tenacy in common. The contract contemplates improvements to be made at the common expense, to be paid *pro rata* to their interest. The decree of this court recognizes this. For this purpose either or both of the tenants in common must exercise supervision and render service, or procure it done by a stranger for compensation. The cost of the improvements is not the mere

expense of material and labor; it embraces also the expense of survey, engineering, design and superintending. The services of the architect, the millwright, the engineer, the superintending master of the improvements, all add legitimately and necessarily to the cost of them. And it is wholly immaterial whether such services be rendered by a stranger to the title or by one or both of the tenants in common, they are equally chargeable to the cost of the improvement. If the services charged for had been rendered by a stranger and paid for by H. Jones, there could be no reasonable doubt about them. And why in this view are the services less a charge against the property, as within the cost of improvements, because rendered by H. Jones, than if rendered by John Doe or Richard Roe? The whole argument applies *a fortiori* to the services of Loyal H. Jones.

But the court reduces this sum to $9,172, and this it does by disregarding the provision in the Gloversville contract, upon which the decree of this court must be founded, that "there shall be a general settlement of all accounts at the expiration of every six months." The defendants contend that the provisions of this contract shall not be disregarded, and that a balance shall be struck every six months as was done by the commissioner; and we think we may reasonably contend further, that every sum paid out should draw interest from *the time it was advanced,* and think this is within both the spirit and letter of the contract; and if so, the balance would be, as shown by the accounts, $50,136 70; one-fourth of which amount would be $12,534 17; add the $1,250 and interest, $236 14—$1,486 34; would show due from complainant $14,020 47. In neither of these computations is interest reckoned; but enough of the receipts are applied to extinguish the interest due at the end of the six months by the report of the commissioner, and at the end of each year by the decree of the court. But the defendants contend that

under the contract the *advances* should draw interest *from the time they were made*, and if so there is due from Reed as above stated, $14,020 47.

In regard to the claim of the complainant that this court should decree that the heirs of Jones shall pay to Reed $8,768 42 for the rent of these premises, without requiring Reed to pay anything for the property or improvements, it may be replied, that as the commissioner who took the account and the circuit court for Marquette county, did not understand the decree of this court, made in this case, as requiring the account to be taken in that manner, of course there has been no attempt to make up the account in that manner, and all the accounting which this court has, consists of the ingenious figuring of complainant's counsel, based wholly upon imaginary sums for which he supposes the mills and property could have been rented. Neither the circuit court nor the commissioner ever called on the defendants to account in such a manner. It is evident that no such accounting has been taken, and the defendants have not been called on to show what the rent of the mills, houses, and different parts of this property were really worth, except by accounting as the commissioner required them to do, and as they have done. Several of the houses for which the complainant's counsel have figured up such large rents, have long since fallen down; one was sold for five dollars, as the accounts show, and only one of them is now left standing How manifestly unjust it would be for this court to make a decree based on these figures for fanciful rents, when there is no evidence that said houses were standing for a single year after the time spoken of by the witnesses, or that they were standing at the time of the filing of the bill. All the rents proved by the witnesses are credited to the property, as the accounts show. This court will not base a decree upon this imaginary statement of the counsel in his brief, and reject the accounts

which were taken before the commissioner with so much labor, of the actual accounts for expenditures and receipts, *not one item* of which does complainant show unfair.

The complainant urges upon this court that he should not pay for the new saw mill, as it was "a private speculation," and yet he asks this court to allow him for the rent of said mill; and in the brief, of course, it is set down with the interest at the sum of $12,432; of which he claims one-fourth, besides $104 64 for the rent of "the upper part; of the new saw mill." And the counsel further claim the sum of $3,419 10 as the avails for the sale of lots, part of which was paid for lots with water powers attached, up to the time of filing of the bill. All these sums have been credited to the property in the accounts rendered on file.

Complainant objects to paying the expense of the lock required by the dam charter. This dam could not be kept up without building the lock. The citizens of Neenah paid a part of the expense, so that a lock large enough for navigation by steamboats might be built, and all these improvements made by Jones and his estate *without the aid of Reed*, have rendered this property valuable, as appears by the testimony. The court can have no doubt on this subject. Is it not conclusive that neither Jones nor his representatives would make unnecessary expenditures to charge Reed with one-fourth, when three-fourths must be paid by themselves?

The decree of this court, reversing the decree of the circuit court for Marquette county, provided that "if the said circuit court shall find that the one-fourth part of the proceeds of all sales, and of the rents, issues, and profits of said property, which shall have been received by the said Harvey Jones in his lifetime, and by his legal representatives since his death, is equal to the amount which ought to be charged to the said complainant," &c. Yet the complainant's counsel contends that notwithstanding Reed is allowed, in this accounting, one-

fourth part of the proceeds of all sales made by Harvey Jones, in his lifetime, and by his legal representatives since, as required by said decree, that Reed should be decreed one-fourth part of all the lots that have been sold by the administrators. There would have been no growth of the town and consequent advancement of this property from $50,000 to $150,000, if it had not been for these sales of lots and water powers, thereby drawing in citizens, causing the erection of large flouring mills, machinery, shops, stores, and dwelling houses. This can not be disputed! It would be most unjust to all parties, and to the citizens of Neenah, to compel those who have erected these mills, to buy them again of Reed at their present enhanced value. This court, if it were to make such a decree as Reed asks for, would do great injustice, and cause endless difficulties and litigations. Reed has had the benefit of all these sales by the consequent rise in the value of the large property he is to recover by the decree of this court. Reed has been credited one-fourth of the proceeds of all the sales; he does not dispute the fairness of a single sale. It was necessary that the town proprietors should sell at low prices to bring in settlers. Will this court say that Jones' estate, owning three-fourths, shall make all these sales for low prices and Reed hold all his interest to get the enhanced value?

It must be evident to this court, that it has gone to the *very extreme of equity* to decree Reed one-fourth of this large property, taking it from the infant heirs of Harvey Jones, when Reed so utterly failed in all material points to perform the Gloversville contract. He stands the owner of tracts 5 and 11, for which he paid nothing. He did not pay the 1,250 dollars as he agreed to do. He has not paid one cent, or offered to pay a cent for the immense improvements made by Jones, as he supposed on his own property, and which alone have made it so valuable. Reed is to get one-fourth of this

property, worth, with the improvements, at least 200,000 dollars, and pay, if he pays no more than the amount reported by the commissioner, only $13,343 55, or if this court decree him to pay as the defendants claim, it would be only $14,020 47. Under such circumstances we respectfully apprehend that this court, after decreeing an accounting for "all sales made by Harvey Jones in his lifetime and by his legal representatives since," will not virtually annull their own decree by giving Reed one-fourth of the lots disposed of by these sales. If this court makes a decree at all, we think it will not go beyond the terms of the decree made in the circuit court. The commissioner took the account of the "proceeds of all sales made by Harvey Jones in his lifetime, and by his personal representatives since," also of all expenditures and receipts, and proofs of their being necessary, and this would show the rents, issues and profits up to the time of taking the proofs as the decree of this court required. We repeat, this property with the mills, dam, and improvements, made by Harvey Jones, is proved to have been worth in 1849, the year that the bill was filed, between 45 and 50,000 dollars.

The injunction obtained by Reed was issued April 17, 1849, in compliance with the prayer of the bill, restraining Jones from "selling, conveying or disposing of any of said property. It was urged by Jones that the property had been laid out into lots, and was rapidly becoming valuable, and that to stop the sale of lots would stop the growth of the town, and prevent the erection of the flouring mills, which it appears have been built on said property and which have made the property so very valuable at this time, it being admitted that whereas it was worth from $40,000 to $50,000 *with the mills and improvements*, it is now worth, *exclusive of the improvements*, $100,000 to $150,000; and it cannot be doubted that the sales which have been made, have contributed to create that enhanced value, and without doubt the

property now unsold is worth double what the whole would have been without these sales of lots and water powers, and the erection of said flouring mills, and other machinery. The proofs in the case most abundantly show this to the court. The injunction was dissolved by Judge Stowe on these very grounds. The testimony of Yale, who is the complainant's witness, shows that the erection of the new saw mill "would enhance the value of the property generally," and who also says that " every building erected on this property would have enhanced the value," which must appear very obvious to the court.

The counsel for complainant seems to think it highly improbable that the expenditures on this property over the receipts could be as much as the account taken by the commissioner shows, to wit: $50,136 70.

The answer of H. Jones shows that his expenditures, which were a charge against the property, amounted, so long ago as April 1849, to the sum of $18,411 67. Now this sum alone which was paid out by Jones in his lifetime, with the interest would amount to over $40,000 ; add the expense of the lock as required by the dam charter, with interest, $16,-116 96, and expenses of repairing the dam as proved necessary, $7,000 and you find the sum for necessary expenditures to be $63,116 96 ; one-fourth chargeable to Reed, would be $15,-779 24. Which is more than the account claimed by the administrators of Reed, by $1,758 67. So much for the improbability of the claim. It must be recollected there are a great many other necessary expenditures incident to building up a new town, towards which Reed has done nothing, such as taxes, roads, bridges, streets and school houses, &c., &c.

But if we are surprised at the decree of the circuit court for Marquette county, made 2d May, 1854, that Reed should have one-fourth of the property without paying the 1,250 dollars, or anything for the improvements, what shall we

say to the claim set up in the brief of Reed's counsel, that this court shall decree Reed one-fourth of the property without paying the 1,250 dollars, or anything for the improvements, but also that the infant heirs of Jones should pay the sum of $8,766 42. Thus, Reed agreed with Jones to help build a town, Reed does not perform at all, does not pay a cent; and yet, after Jones makes a town, this court is called called upon to say that Reed shall have one-fourth of what is valued, without the improvements, at 100 to 150,000 dollars, for nothing, and pay Reed $8,766 42 for taking it. This is the case in a nut-shell! and is not the proposition monstrous!

The counsel contends that Reed should only pay $3,000 for the dam. The complainant proves by his own witness, Williams, who certainly did not wish to over-estimate the value of this dam, that it was worth $10 per foot to built it. And the testimony of Asa Jones shows that this dam was over 1,300 feet long. This would make the dam cost $13,000, or if the reduction was made on account of the height to $7 per foot, it would be $9,000 besides the interest. Col. Jones owned three-fourths of the property, and supposed he owned the whole of it, and is proved to be a sagacious and prudent man, and probably built the best and cheapest dam he could. Complainant proves Jones to have been a prudent and economical man by his own witnesses. Proctor says " while Col. Jones lived I considered him a thorough going business man, and always supposed him an economical man."

As to complainant's brief, point 1, objection to the books and vouchers; 1st. Complainant objects to the books because they are between third parties, and refers to authority to show that they cannot be evidence. Now they are not liable to this objection. The property in dispute must stand Dr. and Cr. to the expenditures and receipts, till the ownership

is settled, and the books of accounts, of expenditures and receipts, debiting and crediting said property, are not books between third persons, and do not come within the meaning or scope of those decisions ruling out books of account between third persons.   Besides, the facts in the books, showing these expenditures, to be upon this property, are proved by the testimony of Roberts, Asa Jones, Hiram Wheeler, and others knowing to the transactions.

2d. As to the Vouchers; they are only *prima facie* evidence of the charges in the Books.   How could they be any more directly between the parties when they are shown to be for expenditures for repairs, preservation and use of this property.   They must be receipts from third persons, of course. The complainant has not attempted, in a single instance, to question the fairness and correctness of one item of debt or credit, or of a single sale made of the property.

If no sales of lots could have been made, after the filing of the bill, to induce purchasers to build at Neenah, the place would not have grown as it has, and would not have risen in value, but must have run down.   The administrators could not have built the lock required by the dam charter, and the dam must have been taken down, the mills all stopped, and those who had purchased water powers ruined.   The estate of Jones must have responded in damages.   This course would have ruined the estate as well as the town, and made Reed's one-fourth of no value.   Will the court decree Reed one-fourth of the lots already sold, on which flouring mills of immense value have been erected, and compel purchasers to buy again of Reed, when all this has been done for the benefit of Reed as well as the place, and Reed receives the benefit by the consequent rise of property ?

Judge Stowe, in dissolving the injunction which forbade sales of property, did so because it was for the interest of Reed as well as Jones that sales should be made ; and because

Jones' interest being at least three-fourths, would prevent his doing any thing to injure the one-fourth of Reed, and that Jones' own interest sufficiently protected Reed from any sacrifices being made. Ought not Reed to acquiesce in these sales, and receive a quarter of the avails? The opposite course would be disastrous to the place and to the inhabitants, and lead to endless difficulty and litigation.

In regard to the claims for rents, there is no evidence that defendants could have rented the mills for a quarter of the time. There is evidence that L. H. Jones tried to rent the mills. If he could not get what the mills were worth, will the court hold him responsible for not renting them? There is no evidence that Jones was offered any thing for the mills. There is some evidence that Jewell would have paid $1,000 for the grist mill for one year; but none that Jewell ever made L. H. Jones that offer. But complainant claims in his calculation in his brief $1,500 per year for the use of the grist mill. Is there any evidence that defendants could have rented the grist mill for a single year at that rate? John R. Davis testifies that the average rent of the grist mill was worth from $400 to $500 per year! and that both saw mills, the new and the old, were worth, *take them both together*, from $500 to $600 per year. The complainant's counsel sets them down in the accounting in his brief at $1,650 per annum, besides $60 for the rent of the "upper part of the new saw mill," and makes the whole rent of both mills amount to $19,571 00. The claim of $72 each for "two houses on the point" which the counsel set down at $1,775 is wholly imaginary. What word of proof is there on this subject? The defendants contend that the complainant ought not to have a year allowed him to pay what is due to H. Jones's estate, and that in regard to the costs of accounting, complainant ought to pay one-half at least of the costs in the court below, and ask this court so to decree.

The complainant's counsel, in arguing that the complainant is chargeable with only such of the improvements, from the date of the contract to the filing of the bill, as were necessary, is mistaken in the spirit and meaning of the contract and of the decree of this court. The contract contemplates such improvements as may be thought necessary; this does not mean such as are absolutely necessary in a logical sense, but such as the parties deem judicious for their interest; and the decree of this court going upon the contract, only follows the *language* of the contract in the *spirit* of the contract. "Such improvements as are thought necessary" is language of discretion. The "thought" when such improvement should be necessary, belongs to the parties, and when one only acts the party refusing or neglecting to act tacitly and necessarily delegates that power of judgment to the other. In a logical sense, no improvements could well have been necessary. The parties could have lived, and the world wagged without any, and none in such sense could ever have been necessary. But the parties meant necessary, *quoad hoc*, prudently essential to their enterprise. And the complainant having stood by, and seen all these improvements made, without objection, is not to be permitted now to deny that they were necessary. In the proper sense of the contract, the proof shows them to have been necessary, that is, essentially advantageous to the estate.

E. W. DRURY.

I think it unnecessary to add to Mr. Drury's brief. I adopt his argument. E. G. RYAN.

*E. L. Butrick* in reply.

In replying to what Mr. Drury facetiously terms his "brief," it is not the intention of the complainant to argue the merits of the main question already decided by this court. The *interest* of complainant in the property is *res adjudicata*, and

we presume that the evidence " that this court has gone to the *very extreme of equity*," in defining that interest, is much more clear to the mind of the counsel for the defendant, than to the court.

Mr. Drury says, that " the accounting required by the decree of this Court has been taken," and that the Commissioner's report was founded upon the accounts, &c., which the administrators were able to produce, but he does not claim that these accounts were legally proved. If so, where are his authorities? He triumphantly asks, " If the vouchers had been false, and not given for expenses properly chargeable against the property, could we not have found one man out of the 1,568 to deny the truth of said vouchers?" Our answer to this luminous proposition is, that we considered it time enough to impeach his books and vouchers when they were properly and legally presented.

Again, defendant's counsel thinks that the commissioner did not allow enough. We think Mr. Drury blames the commissioner without cause. He *allowed all they asked*, only claiming the right to compound the interest in a little different manner. We claim that the decree of this court should govern the commissioner in making his report, and the circuit court in pronouncing its decree. That when complainant made his tender, the Gloversville contract, as to all subsequent expenditures, was in equity performed. We were entitled to a deed *then*, and that contract had no influence or control thereafter; this court in its decree has so considered it. Does the decree of this court say anything about interest every six months? In answer to Mr. Drury's pitiful objections to the allowance, by the commissioner and the circuit court, of the sum of $300 and interest to complainant, part of which was for " personal services," we have only to say that we did not ask the circuit court to allow it. We have not insisted upon its allowance by this court. We claim that

neither party is entitled to any compensation for personal services. The circuit court was disposed to give defendants all they wanted in reason, but the sum of nine thousand five hundred and thirty-three dollars and thirty-four cents, as compensation to the "energetic" Harvey Jones and his *disinterested* administrators, was asking too much.

Mr. Drury admits that *one tenant in common cannot charge another tenant in common for services.* He goes further, and admits that *one tenant in common cannot charge another for expenditures for improvements, or care of the common estate.* We are satisfied with both propositions, and are pleased that Mr. Drury has stated the *only legal propositions* to be found in his "brief," so correctly. But he says Mr. Loyal H. Jones acted under the Gloversville contract; that prescribed his duties and defined his rights. In other words, sickness or misfortune having taken the party with whom we made the contract, and against whom we filed the bill, to answer for his wrongs, not only in this, but all other cases, at "Heaven's Chancery," Loyal H. stepped into the dead man's shoes, assumed his responsibilities and acquired his rights. We deny the proposition. He had no powers, except as administrator; no powers as administrator, except as the statute conferred them upon him. It was not necessary for complainant to make him a party, except for the purpose of reaching the rents and assets. We never sought his aid. We never recognized his right, either directly or indirectly, to expend a dollar upon the property.

Again: The defendant's counsel thinks we should have no pay for the log houses, because one was sold for "five dollars." Where is the proof of this? Why, "*the accounts,*" says the learned counsel. The complainant, finding that the proofs submitted by the defendants were of such a vague, general, unsatisfactory and insufficient character, and such that no court or commissioner could base a decree upon them,

sought by such proof as he could obtain, to carry out the provisions of the decree of this court. He assumed, as a principle of law, and as no authority appears to the contrary in the counsel's brief we presume he admits its correctness, that the administrators having, as appears from their own showing, used the funds in which we have an interest, and with an utter disregard of their duties as administrators, for purposes of private speculation, they were bound to pay us what the use of the property was worth.

We claimed further, that while the defendants had erected the new saw mill upon the joint property as a private speculation, and without our consent, they could not compel us to pay the cost of its erection, yet being bound by the decree of this court to aid in its repair, we were entitled to one-fourth of the proceeds thereof. One-fourth of it *is ours*. We were entitled to one-fourth of it when we tendered the money in payment for the property. Why, then, should we be deprived of what the use of it is worth?

We claim that defendants had no charter for their dam; we insisted upon it as a point in our bill, and defendants have shown no authority to Harvey Jones to *build* the dam. The decree of this court contemplated no charge to complainant of the lots sold since the filing of the bill. The commissioner was not required to take any proof thereof. Those who have purchased lots and erected buildings, have done it with their eyes wide open, with a full knowledge of our rights, and with quite as contemptuous a disregard of them as Harvey Jones exhibited in his life time, and his administrators since his death. We give no thanks to these defendants for the growth of this town. It has grown in spite of them, and we are uncharitable enough, after having examined the accounts filed by these administrators in the probate court, and the enormous balance of expenditures over receipts, now claimed by them, to believe money, money *for their own uses*, was

the main spring of all their actions. We admitted that the property in dispute, independent of the improvements, is worth $100,000, but we did not admit that the improvements upon the property have enhanced its value. On the contrary, we think we have shown conclusively that it would be more valuable without the dam than with it. And here permit us to say further, in relation to the dam,—Leonard Williams swears that a dam across the stream would not necessarily be more than 350 or 400 feet, and the height of this, to wit: 4 feet, would cost from six to seven dollars per foot. We think Mr. Drury misapprehends this testimony when he makes Mr. Williams swear that it was worth $10 per foot. If 400 feet would build a dam, why build one 1,300 feet long? Must we pay for such extravagance?

But the position taken by the counsel, that the sales made by the defendants, have enhanced the value of the property, is no excuse for them. They could not conclude our rights without our consent. We have desired from the beginning to have a little something to do with the disposition of our property, and while we are willing to fulfil the " letter of the bond " ourselves, we claim all that we are entitled to from the defendants, even to the " pound of flesh." We had supposed that the *terrible sacrifice* made by Harvey Jones in giving us tracts " five and eleven," was disposed of, but Mr. Drury in default of something more effective, still harps the same old tune. Harvey Jones made a fortune by the speculation; from July. '46, to April, '49, it had increased in value from $5,000, the purchase money, to $50,000.

The counsel either wilfully perverts the decree of this court, or he misapprehends it. The court does not decree an accounting for "all sales made by Harvey Jones in his lifetime, and by his legal representatives since;" but for the order of this court in that regard we beg to refer to the order itself.

Again, the counsel assumes that we claim the balance

stated in our brief, without deducting the payment of the purchase money. This is not so. The court will find the amount added to the balance charged to Reed, in our brief.

As to the rents, we are willing to set the facts sworn to by defendant's witnesses against their opinions. Is it probable Mr. Davis would rent the grist mill for $600, when, as he swears, the profits of it were $1500? Were the two saw mills together worth only $500 or $600 per annum, when the new one was rented the previous year at the rate of nearly $3,000, and the earnings of the old mill, when the race was a " rivulet " and the dam good for nothing most of the time, were from July, 1846, to April, 1849, $2,372 36, over $700 per annum? The claim of $72 per annum for the house on the point, the court will find proved in Yates' testimony.

The complainant's counsel hardly deems it necessary to add to what he has already said in the cause. Mr. Drury cites no authorities, he uses no legal arguments, he takes no position which can commend itself to the consideration or sympathy of this court. He whines through the case now, as he has whined through it for nearly eight years, with no appreciation of its strong points, and no regard for the complainant's rights therein. We have presented the case, we trust, fairly. We have backed up our positions by authorities which we conceive to be conclusive, and we leave the case with the court in the full belief that it will do us justice.


*By the Court,* COLE, J.   When this case was before this court at the December term, 1854, the rights of the respective parties under the contract of July 23d, 1846, were adjudicated and settled: and therefore the questions arising upon the contract are not now before us for consideration. All that remains to be done in the case is to carry out the decree then pronounced in the cause.

The decree remanded the cause to the circuit court, with directions to said court to enter an order therein, referring the same to a commissioner, to bring before him upon proper notice, the parties to this cause, and to take proofs,

1. As to the amount of necessary improvements made upon the land described in the contract from the date of such contract to the time of filing of the bill herein; by whom the same were made, and the expenses thereof, with the dates and amounts of all payments for such necessary improvements made by the parties respectively.

2. As to the amounts expended in making such improvements upon said property as were necessary and required for the due use and preservation thereof, at any time since the filing of the bill, with the dates of such expenditures and by whom paid.

3. To ascertain the amounts received by either of said parties, from the sales of any portion of said property previous to filing the bill; and

4. Of all rents, issues and profits, derived by either, and all of the parties to this cause from said proporty from the 23d day of July, 1846, to the time of closing the proofs in the case.

The commissioner was to report to the circuit court all of the proof by him taken as to the character and necessity of the improvements, the costs thereof, by whom paid, and the dates of payment, as well as all proofs touching the receipt of rents, profits and proceeds of sales; and that upon the coming in of said report, that the circuit court should proceed to render a final decree, in pursuance of further directions contained in the decree of this court. The case was referred by the circuit court to a commissioner to take testimony and make report thereof in conformity to this decree. A vast mass of testimony was taken by the commissioner, under objection mainly by the complainant, and reported to

the circuit court. Exceptions were taken also by the complainant to the report of the commissioner, but it is impossible to tell from the record what exceptions were sustained, and what overruled. The circuit court then made the decree from which the present appeal is taken.

Although this court in its decree, laid down very clearly and distinctly, the principles upon which the account between the parties was to be stated, still they do not seem to have been fully comprehended by the circuit court, the commissioner who took the proofs, or the counsel of the respective parties. Indeed, it seems almost incredible how the circuit court and the commissioner could have so misapprehended the purport of the decree in reference to the grounds upon which the accounting was to be made. But before I proceed to notice some of the errors of the commissioner in taking the testimony and stating the account between the parties, I deem it proper to make some observations upon one or two points taken by the counsel for the complainant and appellant in his brief and in his argument.

It is contended that by this decree the complainant is bound only to contribute his proportion of the expenses of actually necessary improvements made upon the property; and that hence he ought not to be compelled to pay anything towards such improvements as the main dam, new saw mill and some other improvements, which it is insisted were matters of speculation undertaken on the part of the defendant, Harvey Jones. Such is not a fair and proper construction to be given to this decree. And it is absolutely essential to understand the grounds upon which the decree proceeds to keep fully in view the facts and circumstances of the case upon which the decree is based. Ordinarily, perhaps, it would be held that one tenant in common could not charge the other for such extensive and unusual improvements as were made upon this common property. But it must be borne in mind that the

parties in this case occupied peculiar relations to each other. It clearly appears from the contract of July, 1846, and many other parts of this case, that it was contemplated and expected by the complainant on the one hand, and Harvey Jones on the other, to lay out a village site and build up an important town on the property mentioned in the contract. To accomplish this object the parties correctly foresaw that they, as proprietors of the town, in order to induce people to come there and settle, would have to expend considerable sums of money in making improvements—that material repairs would have to be made upon the old saw mill, grist mill, race and wing dam in existence at the date of the contract, and undoubtedly other improvements, perhaps of a somewhat public character, were also contemplated. So also as intelligent and sagacious business men they well knew that the improvement of their water power would tend greatly to attract settlers to that point. Hence the main dam which was afterwards built, increasing the hydraulic power there, and the new saw mill affording the public greater facilities for procuring lumber, though these improvements might not have proven to be as profitable investments as some others by the direct returns upon the capital employed, and in the strict sense of the word could not be considered "necessary," yet by the collateral advantages resulting from them to their other property and the town, might have been the most judicious and wisest investments that could have been made. The "necessary improvements" spoken of in the decree were such as were proper, fit and adapted to the accomplishment of the double object in view; the enhancement of their property by the improvement, and the building up of an important town at that point.

Again it is contended that the proof shows that the main dam was improperly constructed, and that in consequence thereof it became a source of ruinous expense to keep it in

repair, and that the complainant, if chargeable at all for its construction ought only to pay his proportion of what a good permanent dam would cost. True, there is considerable testimony in the case strongly going to show that the main dam was not as economically built as it might have been, and that it was not constructed upon the best plan and with the most suitable materials, and that in consequence of these defects in its construction breaches were frequently made in it which cost large sums of money to put in repair. We discover, however, no evidence in the case that Harvey Jones wilfully or wantonly squandered money in building the main dam or in making any other improvements or repairs upon the property, but on the contrary, we are satisfied that he exercised his best judgment in the premises. If he made mistakes or committed errors, as it is probable he did, they were errors of judgment, such as any prudent, vigilant business man might have committed under like circumstances, and therefore he ought not to be held entirely responsible for them. We therefore think it just and equitable that the complainant pay his proportion of what these improvements and repairs actually cost Harvey Jones, or his estate.

Of course when we speak of improvements made by the administrators of the estate, we only refer to such as were contemplated in the decree of this court as being "such im-"provements upon said property as were necessary, and "required for the due use and preservation thereof." It was not supposed that any other improvements would be made after the commencement of the suit by any of the parties defendants. And perhaps I need make no further remarks in explanation of the 1st and 2d grounds upon which the account was to be stated as laid down by this court after saying that it was obviously intended that " the commissioner should, by competent proof, ascertain the expense of the improvements made upon the property at the time such improvements

were made, and by whom made, up to the time of filing the bill; as well as the cost of such improvements as were necessary and requisite for the due use and preservation of the property made since the filing of the bill. The points of inquiry are few and simple, and by a proper course of investigation there would not seem to be any difficulty in approximating to correct results. I now pass to another branch of the case.

In the decree directing the basis of taking and stating the account, the court did not declare that a different rule of proof would be observed from that which is usually applied. The 71st Rule in Eq., (Circuit Court Rules,) directs that all parties accounting before a commissioner shall bring in their accounts in the form of debtor and creditor. The general principles on which an examination before a master was conducted, and the mode of taking testimony, are given in *Remsen vs. Remsen*, 2 J. C. R., 494. In the present case the commissioner departed widely from the ordinary course of proceeding. He permitted the defendants for the purpose of charging the complainant with expenditures for improvements and repairs, to introduce schedules of accounts numbering from 1 to 16 inclusive, and to substantiate the same by books of account verified by the oath of L. H. Jones, and the book-keeper, Roberts. The accounts are headed, " Mill Accounts," " Neenah Mills to Jones and Yale," " Jones and Yale's Account with Neenah Mills," " Neenah Grist Mill Account," " Saw Mill Account," " Water Power Account," " Lock Account," &c. There can be no doubt but that these books of account were improperly admitted in evidence. The accounts did not purport to be between the parties to this suit, and contain items of charge for merchandize, lumber, logs, wheat, money paid for services and labor, and a great variety of charges evidently relating to business and transactions different from improvements or repairs upon the property. We should judge them to be the

general accounts kept by Harvey Jones in his life time of his business, and of his administrators since his decease. Many of the charges are so vague and indefinite that it is impossible to tell to what business or transactions they do relate, and there is no evidence explaining them; while it is evident that other charges, such as those for wheat, grain and logs, which were used for stocking the two saw mills, and the flouring mill, were improper items of charge against the complainant. He can only by the terms of the decree be charged with the cost of improvements and repairs, and the defendants must establish by something like legal and competent evidence, the expense that Harvey Jones and his administrators have been to in making them. As the case now stands, such is the imperfection and obscurity of the proof upon those points, that we are unable to conjecture what the first cost of these improvements and repairs were.

Another grave error committed by the commissioner was the course he adopted to ascertain the rents and profits of the property. The proper course was to ascertain what was a fair and reasonable rent for the property, and charge the party with this amount which had been in possession. But the commissioner took proof as to the expense of running the mills, including logs for the saw mill, wheat, and other grain, for the grist mill, and wages for the men employed in running them, and also took proof of the credits arising from the sale of the lumber, flour, &c. Although this course would give the net proceeds of the business, yet, for obvious reasons, was not what was contemplated by the decree. The property had been in the exclusive possession of the defendants or their intestate since 1847. They have managed and controlled it, stocked and run the mills, or leased them, as they saw proper, rented the buildings, and conducted the whole business, without any consultation with the complainant; and it would be very unjust and unreasonable to make him

take the hazards and losses of the business which he was not permitted in any manner to control.

Again, as we understand the statement of the account, the commissioner embraced in it amounts received from sales of portions of the property since the filing of the bill. This is directly contrary to the decree, which directed him "to take proofs as to the amounts received by either of said parties from the sales of any portion of said property, previous to filing the bill of complaint herein." If sales have been made since the filing of the bill, they have been made *pendente lite*, and with full notice to purchasers of the claims of the complainant. The undivided one-fourth of the title to all property sold *pendente lite* remaining in the complainant, he ought not to be paid for an interest which he has not released.

The counsel for the complainant earnestly requested us to make an original and final decree in this cause which would settle all matters of difference between these parties, and thus put an end to this expensive and protracted litigation. Aside from the general objection which exists to entering original and final decrees in this court in cases like the present, a practice which the experience of every term shows to be inconvenient and objectionable, there is an insuperable difficulty to adopting that course in this case; that is, a want of sufficient proof upon which to base such a decree. We know very well that valuable improvements and repairs have been made upon the property, all of which will enure to the benefit of the complainant, but as before observed we are unable from the testimony to ascertain the costs of such improvements and repairs. We therefore might do great injustice to both parties should we attempt to make such a decree. It may be said that it is the defendants' own fault that they did not show the value of such improvements by competent testimony. But they offered testimony upon those

points which undoubtedly they considered competent for that purpose, which was admitted by the commissioner and the circuit court. Had this evidence been rejected, as it should have been, they might have shown by unexceptionable testimony the real value of the improvements made upon the property before the filing of the bill, and the costs of all repairs made since the filing of the bill for the due use and preservation of the property.

We, therefore, see no other way but to reverse the decree of the circuit court, and remand the cause for the taking of proofs and stating an account between these parties, and for a final decree, according to the decree of this court made at the December term, 1854.