## R. H. MYERS *v.* F. J. BENNETT.

1. CHANCERY PRACTICE. *Taking Accounts.* By the settled rule of Chancery practice, the parties are required to furnish the clerk with their respective accounts of the matters of reference, from which he can see the points of difference, and limit the evidence to those points.

2. SAME. *Partnership. Balance Sheet.* Where a partnership account is ordered, each partner is an actor, and, unless all the partners join in employing a competent accountant to make out a balance sheet of the business with proper schedules, should be required to furnish his own statement of the account.

3. SAME. *Partnership Books. Should be examined by experts.* Partnership books, to which each partner has had access, are *prima facie* evidence as between the partners, but the partners cannot, in lieu of the statement required, put in their general books of accounts, consisting often of immense folios, which neither the clerk nor the court can be required to examine. It is the duty of the parties to have them examined by experts, to ascertain what they do show, and to extract from them, in the form of balance sheets and schedules, such general statements, and such specific facts as may tend to elucidate contested matters of charge and discharge.

### FROM HAMILTON.

Appeal from the Chancery Court at Chattanooga. W. M. BRADFORD, Ch.

VANDYKE, COOKE & VANDYKE for complainant.

KEY & RICHMOND for defendant.

COOPER, J., delivered the opinion of the court.

On the 1st of April, 1868, the defendant, Bennett, having bought from complainant, Myers, a half interest

in certain mill property in Chattanooga, the two entered into articles of partnership in writing, to run the mills. By the terms of the agreement, Bennett was to manage the business at the mill, with the aid of a clerk to be furnished by Myers, whose services were to balance those of Bennett. It was agreed that "if Myers furnished the capital," he was to be allowed a reasonable per cent for the amount he has to pay for said capital. The business was commenced, and continued until about October of the next year, when it was brought to a close by mutual consent, because found not to be profitable. The only capital put in seems to have been in the shape of corn and wheat to run the mill, furnished by Myers, for a consideration. Regular books were kept of the business, open to the inspection of both partners. On the 28th of April, 1870, Bennett sold and re-conveyed to Myers his half interest in the mill property for $3,800, "a portion of which," says the deed, "is paid in hand, and a portion unpaid, the respective amounts paid and unpaid being unascertained, and dependent upon a settlement of the partnership of Myers & Bennett, which settlement is to be made at an early day, and the balance found to be unpaid at such settlement to be due and payable twelve months from this date, and is to be a lien on the land and lots herein conveyed." The meaning of this peculiar language may be fairly implied to be, that the parties knew, at the time, that the partnership had been a losing concern, and that Bennett was justly indebted to Myers, by whom alone any capital had been advanced, for his part of the

loss, which indebtedness he was willing to treat as a payment on the land. Neither party supposed at that time that the loss to Bennett would cover the whole purchase money, and, therefore, the stipulation for the payment of the balance in a given time, and the retention of a lien for its payment. We learn from the clerk of the partners, incidentally, that he estimated the loss about the middle of 1869 at $2,200.

The parties agreed to refer the settlement of their mutual claims to the award of arbitrators. The original bill in this cause was filed by Myers to set aside the award made under this agreement, and for a general settlement. Bennett insisted on the award, and filed a cross-bill to enforce his vendor's lien for the purchase money of the land. Such proceedings were had that, by a decree of this court, the award was set aside, and a general partnership account and other accounts ordered, and the cause was remanded to take the accounts. At the January term, 1875, of the Chancery Court, the necessary reference was made. The report was presented to the October term, 1877, to which exceptions were taken by both parties, and a final decree rendered on the 20th of April, 1878. The result of the report, and of the Chancellor's rulings on the exceptions, was to leave a balance in favor of Bennett, as of that date, of $1,129.99, for which the Chancellor gave him a decree, and ordered the land to be sold in satisfaction thereof. Myers alone appealed.

This case illustrates the loose practice of our Chancery Courts in taking a partnership account. The

partnership in this case was of the simplest character,. continued in existence only about eighteen months, and kept regular books.    A competent book-keeper in a week of continuous labor, or in a month's time spending only a few hours each day at the work, could have easily made out a balance sheet, with proper schedules, showing the exact status of the firm business, and upon which the master in a couple of hours could have drawn up a technically correct report. Instead of taking this sensible course, without the examination of a single expert to show the substance of the business, the partnership books are handed over to the master, and the learned counsel for both parties, not only thus practically, but by taking exceptions based upon what is shown by the books, and by obtaining an order to have the books sent up to this court, have apparently thought that the partnership books were a part of the record, and could be looked to by the court.    The clerk, under these circumstances, having only these books without any assistance from the parties, may well be excused in reporting,. as he did from term to term for nearly three years,. that the report had not been completed for want of time.

By the settled rule of chancery practice, the parties. are required to present the clerk with their respective accounts of the matters of reference, either before or after they have examined their adversary on interrogatories.    2 Dan. Ch. Pr., 1221.    It is by a comparison of these statements, that the clerk is enabled to see the points of real difference, and to require evidence

from the parties touching those points. In far the largest number of items in an account between parties, and especially in partnership accounts, there is no controversy. But the master is at sea in reference to the real points of difficulty unless he is furnished with these statements. Where a partnership account is ordered, each partner is an actor, and may furnish his own statement. The sensible rule is for them to unite in employing a competent accountant to make out a balance sheet of the business, with proper schedules, and to be ready to testify as to the exact showing of the books upon any disputed point. If they cannot agree, each should be required to furnish his own statement. The partnership books, to which each partner has had access, are *prima facie* evidence as between them. *Taylor* v. *Boyd,* 6 Heis., 613. But the parties cannot, in lieu of their respective statements, put in their general books of account. *Reed* v. *Jones,* 8 Wis., 421. These books usually consist of immense folios, which neither the clerk (*Turner* v. *Hughes,* 1 Busb. Eq., 116), nor the court can be required to grope through. *Norwood* v. *Norwood,* 2 Bland, 481 in note; *Budeke* v. *Ratterman,* 2 Tenn. Ch., 459; *Poor* v. *Robinson,* 13 Bush, 290. It is the duty of the parties to have them examined by experts, to ascertain exactly what they do show, and to extract from them, in the form of balance sheets, exhibits and schedules, such general statements and such specific items and facts as may be in dispute, or tend to elucidate contested matters of charge or discharge. Without the light thus afforded, the books themselves

would rather tend to mislead than to enlighten, and the record would be uselessly encumbered to no purpose.

If parties do not choose to adopt this mode of accurately ascertaining their rights, they must take the consequences. It is impossible to act on scientific principles at the end of a long lawsuit, if the parties. have themselves ignored all the rules of science. It is to the interest of the Republic that there should be an end of litigation. It is still more to the interest of the parties, even at the risk of some doubt in relation to the scientific accuracy of results.

The method of taking a partnership account is: 1. To ascertain how the firm stands in relation to third parties. 2. To ascertain what each partner is entitled to charge in account with his co-partners. 3. To apportion between the partners all profits to be divided, or losses to be made good, and ascertain what, if anything, each partner must pay to the others, in order that all cross-claims may be settled. 2 Dan, Ch. Pr., 1249.

The substance of these rules is, that the profit or loss of the business must be first ascertained, and then how this profit or loss is to be shared by the respective partners. *Hicks* v. *Chadwell,* 1 Tenn. Ch., 251. The master, in this case, has evidently aimed to attain these results. The defendant has not appealed, and his exceptions to the report cannot be noticed, under the settled rule of this court, that in this class of cases, an appeal by one party brings up the case only as to his exceptions.

The first and main ground of error relied upon

by the appellant Myers is, that he is charged with the entire products of the mill, thus onerating him with the labor and duty of surcharging and falsifying. The clerk does seem to have made his statement in that form, when it ought to have been an account of Myers & Bennett, with profit and loss. But upon careful examination the account is in reality of the profit and loss. If it had purported to charge Bennett with the assets, the result would have been precisely the same. It is based upon the books, and in no event could either partner have changed the result except by the introduction of competent proof to remove the *prima facie* case.

The next objection is, that the Chancellor erred in charging Myers with one half the loss of the capital stock, the clerk having already charged him with the whole of it. But, as we have seen, the latter charge was a mere form. The account really ascertains the profit and loss. There was a loss greater than the capital stock, and each must bear his equal share of the loss. For the same reason, the third assignment relied on is untenable. The debt mentioned was only included in the general account to ascertain the profit and loss, and one credit was all the complainant was entitled to. The last assignment, based on the 12th exception, is not available, because no such claim was made or entered on the books during the existence of the partnership, nor any contract on which to base it. Other exceptions not argued are clearly untenable.

The decree will be affirmed, and the appellant will pay the costs of this court.