ROBICHAUD et al. v. SMITH et al.—232 S. W. (2d) 576.

Western Division.   At Jackson.   December 12, 1949.

Petition for Certiorari denied by Supreme Court, August 31, 1950.

652

654

Gilliland, Pittman & Morgan and W. M. Hall, all of Memphis, for appellants.

Canale, Glankler, Loch & Little and John S. Montedonico, all of Memphis, for appellees.

SWEPSTON, J. This suit arose out of three joint adventure contracts among the three complainants and the defendant.

The three contracts covered respectively dirt moving jobs known as the Meridian (Miss.) job, the Mansfield (La.) job and the Modoc (Ark) job, the first two being Army Air Bases and the third the Levee along the Mississippi River, during most of the year 1943 and up

to January 1944, which, of course, was during the World War II era.

Defendant Smith was at the inception of this partnership an established contractor of many years experience. All three complainants had worked for Smith for many years and were experienced in this type of work and were employees of Smith, when the partnership was formed, on salary of not over $85 per week.

Smith had been working under an arrangement with one Cook, which will be later adverted to, on the Mansfield Base during the latter part of 1942 and early 1943. He closed out with Cook and had a substantial sum of money and a large quantity of dirt moving equipment. He then obtained three subcontracts on the Meridian job and began performance with these three complainants still in his employ. About six weeks later these four men entered into partnership on the Meridian job, making it retroactive to February 16, 1943, and on the Mansfield job which Smith later obtained also in his own name. A few weeks later Smith obtained the Modoc job in the name of the partnership and the partnership agreement was subsequently made effective as of August 10, 1943.

Each joint-adventure contract provided that it should terminate at the end of the fiscal year following completion of the particular job and contain the same provisions that are material here.

Each party should devote such of his time and efforts as necessary to efficient performance of the work, for which he was to receive no compensation except his share of net profits on the ratio of 20½ per cent to each of the complainants and 38½ to defendant; but advances on drawing account could be made by agreement.

"3. The undersigned, Gerald Smith, agrees to advance or make available for the joint adventure sufficient funds

to finance the work, to arrange for the procurement of supplies and material and to make available for the joint adventure, upon reasonable terms to be agreed upon, sufficient equipment to perform the work. Gerald Smith shall have the right and authority to borrow money for use in the joint-adventure and pledge the credit of the undersigned as joint adventurers and to pledge, assign and otherwise encumber any assets of this joint adventure to secure such loan.''

''4. Any and all proceeds from the work under said contract shall be received by the joint adventure and deposited in a bank or banks. Said funds so derived from the work and all other funds used by the joint adventure shall be under the control of Gerald Smith and the same shall be disbursed upon his order in furtherance of the work and of the joint adventure. All expenditures connected with the furtherance of the work and approved as such by Gerald Smith shall be considered as job costs and charged against the work. Accurate records and accounts of the affairs of the joint adventure shall be kept and they shall be available at all times to any party hereto.''

Other than the foregoing the contracts do not specifically provide for payment of the cost of repairs on equipment rented by the partnership.

Subsequent to the formation of the partnership all four men continued to perform the same type of work as before, Robichaud as a field record keeper and general superintendent, Lancaster as a supervisor seeing to the proper performance of work, Eastham as a supervisor of machinery and maintenance of same, and Smith as the head of the business and procurement end.

On the Meridian and Mansfeld jobs the equipment used was that which Smith already owned and which he

had accumulated from 1939 to 1943 plus some newly purchased. On the Modoc job it became necessary to rent a substantial amount from other sources. It was understood by all parties that Smith's equipment would be used.

After completion of the last job, Modoc, complainants began to agitate for settlement by Smith, who delayed for some time until certain items could be entered on the books. Eventually it developed that the parties had reached an impasse arising out of the amount of rent Smith claimed for the use of his equipment and the amount of repairs and other items Smith claimed as job costs, which were sufficient to show a loss on the total operations.

On November 10, 1944 complainants filed their bill of over forty pages charging Smith with many derelictions toward the other partners.

For the present it suffices to state that the principal allegations are that Smith had forced the firm to use his equipment and that same was so old and worn that it was unable to do the work and required an excessive amount of repairs causing loss of time and delay and making necessary the renting of other equipment to complete especially the Modoc job; that on account of its condition at the outset, Smith had agreed verbally that no repairs were to be charged to the firm, but would be paid for by him individually; that the rent he should receive would, under OPA regulations, be based on the actual time the equipment was in use and not for any time any equipment was laid up for repairs; that the maximum rental Smith would be entitled to under OPA rules on all three jobs is $69,500; but that Smith is now claiming $211,000 as rent and that he has charged against the firm as job costs both the repairs to his equipment

and other items personal to him of more than $160,000, the effect of which would be to show a loss of a large sum on the firm's operations, whereas, in fact, with these items corrected, a large profit would accrue.

Among other relief sought an accounting was prayed.

Smith answered the bill in detail denying all derogatory charges but admitting that he claimed the items of rent and of job costs as a proper charge against the firm. By cross-bill he prayed for an accounting.

The cause came on for hearing before the Chancellor, but as no proof had been filed and no order or stipulation for hearing on oral testimony had been entered, he ordered a reference and by mutual selection appointed the Honorable John W. Harris, of the Memphis Bar, Special Master.

No exception was taken to the fact that a reference was ordered, although each party excepted to certain provisions of the order. Voluminous proof—over 2,000 pages—was filed and the Master filed a 24-page report with citations to the record.

The Master allowed $174,831.22 as job costs chargeable to the firm. These items consisted of supplies, fuel, oil and grease, tires and tubes, legal expense, etc., and repairs and maintenance of $122,428.14 to Smith's equipment and repairs and maintenance to equipment rented from others. Ex. 12.

As to the firm liability for rent to Smith, two of the complainants, Lancaster and Eastham testified that Smith agreed to charge no rent; this, of course, was in the teeth of the contracts and of the bill, in which latter the complainants tendered the sum of $69,500. The third complainant testified that he understood all the time that Smith was to receive reasonable rent. The Master allowed $39,815 for rent.

After fixing the two items of rent and job costs, he found a net profit for distribution of $81,273.94, or $16,661.16 to each complainant.

After charging each complaint with sums each had already drawn and crediting each with $316 as their part of the cost of an auditor, Chumley, complainants had employed, he found there was due Robichaud $8,163.42; Lancaster, $4,817.95; and Eastham, $11,354.02.

Both parties filed exceptions to the report which were heard by the Chancellor over a five-day period.

The Chancellor allowed defendant's exceptions to these two items; he increased the rent due Smith to $105,386.69, adopting the Miller formula which appears in evidence; he disallowed the audit fee of Chumley as a charge against the firm, thus eliminating the charge of $948 against Smith and the credit of $316 to each complainant.

Otherwise, the report was confirmed with the result that the net profit to each complainant is $3,218.96, so that each having already drawn more than this amount would be indebted to defendant, but defendant has waived the excess. Decree was entered accordingly.

The case is here on writ of error.

Complainants have assigned error as follows:

## I.

The Chancellor erred in holding that defendant Smith was entitled, under the articles of joint adventure, to charge the partnership with $105,386.69, compensation or rental, for use of his equipment on the three joint adventure jobs whereby he, in effect, sustained defendant's Exception 6 to the Master's Report allowing him compensation or rental for its use only on the Modoc job, and the sum of only $39,815; and, in effect, also sustaining his Exceptions 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13,

14, 15, 16 and 17 to the Master's Report, and modifying the Master's Report accordingly.

## II.

The Chancellor erred in holding that complainants in offering in their Bill and in their counsel's argument before the Court, to allow a charge against the firm in Smith's favor in the sum of $69,500 for use of his equipment on the three jobs, committed themselves to a right in Smith to a reasonable rental and gave him $69,500 as a starting point for determining the same, and estopped themselves from claiming anything to the contrary.

## III.

The Chancellor erred in overruling complainants' Exception XVIII to the Master's Report wherein Smith was allowed to charge the firm with $39,815 for use of his equipment on the Modoc job because complainant Robichaud set up that sum on that account in the statement of costs of the Modoc work several months after that job was finished to submit to the Government authorities in the event they renegotiated the price, which the Chancellor, in effect, did, when he sustained Smith's Exception 6, and the other exceptions mentioned in Assignment No. I.

## IV.

The Chancellor erred in holding that the proof before the Master was sufficient to warrant the Master's overruling en masse all of complainants' objections to Smith's expenditures aggregating $174,831.22, wherein besides $122,428.14 for repairing and maintaining Smith's equipment used on the joint adventure jobs, which had been charged to the firm, there was included the difference of

$52,403.08 of miscellaneous items not relating to repairs, the effect whereof was to overrule en masse complainants' Exceptions I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XV, XVII and XIX to the Master's Report.

## V.

The Chancellor erred in failing to pass on complainants' Exception XVII, and, in effect, sustaining the Master's misapplication of the agreed, or in any event, the undisputed evidence in the record, by holding that complainants were only entitled to an additional credit of $8,303.86 over and above the figure of $16,612.01 at which Smith charged himself in his statement of account as representing the value of the parts on hand when the last job was finished, when he should have held that complainants were entitled to an additional credit for said parts of $23,950.14.

## VI.

The Chancellor erred in overruling complainants' motion to re-commit the Master's Report.

Such action by the Chancellor precluded complainants from requiring the Master to find under the undisputed facts that Smith sold a ⅜ Linkbelt dragline which was purchased and overhauled with partnership money and then sold by Smith for $4,500, which Smith converted to his own use and failed to charge himself with on the partnership books.

## VII.

The Chancellor erred in entering the decree in this cause denying to complainants any recovery from Smith; dismissing the Bill and dissolving the injunction restrain-

ing the defendant bank from allowing Smith to make further withdrawals and assessing complainants with damages on that account in the sum of $5,593.50 and the U. S. Fidelity & Guaranty Company, surety on their injunction bond to the extent of its penalty, $5,000, and directing the taxation of the costs in the proportions the parties were to bear the profits or losses, said Guaranty Company, surety on their bond for costs to the extent of its penalty, $250.

The first three assignments will be treated together.

Under these assignments it is contended that (1) complainants made a tender of $69,500 rent to Smith only on condition that they be not held liable for repairs and maintenance to his equipment and for certain other items as job costs; that the offer was not accepted as made and hence is not binding; (2) the evidence shows that Smith in making the bids or contracts on the three jobs did not include in his basic figures any amount for rent on his own equipment; that, therefore, it would be inequitable to allow him to charge his partners any rent, because he was under the duty as a partner to exercise the utmost good faith; (3) the evidence shows that Smith agreed to put his services and the use of his equipment into the firm, as the reason for his drawing 38½ per cent of the profits as against 20½ per cent to the complainants; and (4) that under Assignment III, there was no estoppel against the firm by reason of Robichaud having set up the figure of $39,815 rent on the Modoc job to be used in the event of renegotiation of that contract by the Federal Government; that, therefore, the Chancellor should have sustained complainants' Exception XVIII to the action of the Master in allowing this amount of rent.

■■ As to complainants' contention (1) above stated, we do not think they are now in a position to make such a claim.

The Chancellor, in his oral opinion, which was taken down, transcribed and made a part of the record, and in the final decree stated that complainants, by their original bill and *by the admissions of their solicitors in open court,* had conceded liability for rent to Smith in the amount of $69,500.

In the absence of a bill of exceptions as to what admissions were made in open court, we are compelled to take the unconditional statement of the Chancellor as being correct.

Furthermore, an examination of the bill readily discloses in numerous places that the complainants construed the contract to mean that Smith was due a reasonable rent. Robichaud so testified, although the other two testified to the contrary and contrary to the allegations of their bill.

In view of this situation the other contentions of complainants under these three assignments become immaterial.

However, we do not think that the record sustains contentions (2) and (3).

■ Referring to (2), while it is true that Smith testified that in making the bids for work he included in estimated costs an amount to cover repairs and maintenance, he was not asked and did not testify expressly that he included any amount as rent or the equivalent of rent on his own equipment, yet it seems perfectly clear that he must have done so in effect.

Mr. Miller, who is an experienced dirt contractor and who gave the formula or breakdown of the component

elements on which these contractors base their bids, testified that actually what they do from experience in the business is to estimate how much a cubic yard such work usually costs and then take into account the soil conditions, the season of the year or probable weather conditions, etc., as a variable factor.

This is analogous to ordinary residential and commercial construction contractor's experience; for ordinary conventional types they know from experience that a structure will cost so much per square foot of floor space without figuring the detail of the plans and average specifications. Even according to Miller's formula, on which the Chancellor based the amount of his figure for rent, they figure a gross profit of 30 to 33⅓ per cent the cost. If we take 33⅓ for easy figuring, that would be an anticipated net profit of 25 per cent on the contract price. Yet, Miller said that his average net profit *realized* runs from 8 to 12½ per cent.

Miller further said that in the breakdown of the bid, if you own the equipment, you figure depreciation; if you do not own it, you figure rent; but in either case you figure the cost of repairs as a substantial element.

Defendant is an experienced and successful contractor; so it seems fair to assume that he acted on the customary basis in making his bids; especially since it appears that the usual net profit is only 8 to 12½ per cent of the contract price, the omission of the factor of depreciation on this type of shortlived equipment would always be fatal to the realization of a net profit and to prolonged continuation in business.

■ Referring to (3), Robichaud testified that he understood that Smith was to receive reasonable compensation or rent to be agreed upon. All three complain-

ants knew that Smith's equipment was already being used on the Meridian job when they contracted with Smith, they knew that was going to be used on the Mansfield job; they knew that on account of war shortages it was difficult if not impossible at times to find equipment for rent. Therefore, the distinction attempted to be made by Lancaster and Eastham that the contract referred to rent only on equipment rented for third parties and not to Smith's equipment is contrary both to the contract and the way the . complainants necessarily understood the contract. Smith's having the equipment was the reason he was able to get work.

Referring to (4) we think the point about estoppel, as held by the Master, immaterial. The Chancellor disregarded this as basis for the allowance of rent and adopted a different basis or reason.

Therefore, we think the only question for this Court under the first three assignments is the *amount of rent*, since there was no concurrence of the Master and the Chancellor.

■ However, it must be noted that while this is heard de novo, the question comes to us in the situation that the decree of the Chancellor is presumed prima facie to be correct, unless we are able to find that the evidence preponderates against the correctness of the decree below.

The burden or task of showing where the preponderance lies is of necessity on the appellant, because the appellee has his decree which is prima facie correct.

On this phase of complainants' brief, although Assignment I is directed at the amount of rent allowed by the Chancellor, the argument is directed almost altogether at an effort to show that defendant is not entitled to *any* rent. We have already disposed of the latter question adversely to complainants.

Smith claimed rent of about $211,000. The Master having been so directed in the order of reference, made alternative findings that (1) OPA did control and (2) it did not.

Under OPA he found the rent to be $205,990.13 and the net profit to be $121,945.08. This left a large deficit for which each complainant would be liable to the extent of over $17,000. R. 182—Vol. 9. He held that OPA was not applicable; likewise did the Chancellor; the contention has been abandoned by complainants and is no longer in the case.

█ Under (2) the Master found that Smith was entitled to no rent on the Meridian and Mansfield jobs but allowed $39,815 on the Modoc job by way of estoppel because of Robichaud's having used that as a rental figure in event of a renegotiation by the Government. This left a·profit almost in the same amount as the deficit under OPA figures.

The Chancellor set aside this latter finding as being contrary to the $69,500 figure tendered in the bill and conceded by counsel in open court at the hearing on exceptions to the Master's Report. He adopted the latter figure as being the starting point in fixing a reasonable amount. He then sought the lowest figure that was consistent with the evidence as to a fair rental under the circumstances, especially taking into account the age and condition of the equipment and of the partnership relation. He used the Miller formula for this purpose. He allowed about half of the conventional rent as shown by the testimony of several witnesses.

Under that formula the percentage of the different items to the total basic cost of a job gives 34% for rent of equipment, 20% for repair parts exclusive of labor, or

a total of 54%. To these and other items of cost is added a gross or margin of 33⅓% profit, which would be an anticipated net of 25% on the contract price or bid, but the usual *net* profit realized is from 8 to 12½%. The Chancellor took the lowest figure of 8% for net.

It is unnecessary to set out the calculation (R. 210-211, Vol. 9) but the figure of $105,386.69 for rent results, as allowed by the Chancellor.

There is no evidence to the contrary except the effort to show that Smith bought this equipment from his former associate, Cook, just prior to these partnership contracts, for the sum of $32,000; that it was so worthless as to require over $122,000 repairs and maintenance; that, therefore, it would be unfair to allow him any rent because he had his worthless equipment rebuilt at the expense of the firm.

The record clearly reflects, however, that Smith did not buy the equipment from Cook, but had it pledged to Cook under a working arrangement entered into with Cook in 1938. Smith had suffered a severe financial setback. Cook undertook to and did finance Smith for 7 to 8% of his gross profits. The operations were in Cook's name and Smith was ostensibly employed by Cook as general manager. Smith bought new and traded in old equipment as he deemed advisable and the equipment he ended up with in early 1943, when he settled with Cook and freed his equipment from the lien, was composed of units acquired from 1939 on to recent date.

Cook had been taking depreciation for his own benefit on what was actually Smith's equipment, so that when they had their settlement Cook's books showed the depreciated value of Smith's equipment to be $32,000. In order to try to keep himself clear with the Government

he made Smith give him a check for $32,000 as the ostensible purchase price of the equipment and then by another book entry gave Smith a credit back.

The evidence amply shows that this equipment was worth far more than this sum in 1943; that equipment was hard to find either to buy or lease on account of war shortage; that under OPA used equipment was being sold at 55% of its original list price, if not reconditioned, and at 85% , if reconditioned; that Smith spent about $70,000 in rebuilding certain equipment and in the purchase of new equipment which was also used by the firm. From the exhibits referred to (R. 210, Vol. 9), it will be seen that, irrespective of the question of repairs, which will be discussed later, Smith's equipment did all the work on Meridian, practically all on Mansfield and the rent received on some of his equipment on this job was more than the rent paid to others, and that on the Modoc job which began the latter part of August, 1943 and ended the latter part of January, 1944. Smith's equipment, with the addition of the dragline rented from the Government, had moved 265,400 cubic feet by October 15 out of 1,000,000 total contracted for before a substantial amount of equipment rented from others came on the job. (Ex. 60 and 68). It is admitted that Smith's own dragline was in excellent condition.

Without detailing this part of the evidence any farther we are satisfied that this position of complainants is without merit.

We find, therefore, that the evidence does not preponderate against the allowance of rent made by the Chancellor and we overrule the first three assignments.

Coming now to Assignment IV, complaining that the Chancellor held the proof sufficient to justify the Master's

having overruled en masse complainants' exceptions to all items claimed by Smith as being chargeable as job expense.

The thread of the argument under this Assignment is that:

1. In the order of reference the Chancellor directed the Master that Smith was to be held as a fiduciary and as such the burden of proof was upon him primarily of going forward with the evidence in stating the account and in justifying the items disputed by complainant;

2. Of the items shown on the books of the firm complainants on the reference filed a list of 458 items objected to in whole or in part. (Ex. 55).

3. That defendant's response, (Ex. 9), shows only 208 items where the invoice supporting the item was approved by some one of the complainants, leaving 258 items where the invoices were not approved by one of the complainants, or where only part of the invoices had been so approved.

4. That 155 of the items were for disbursements amounting to $42,000 made during the eight months succeeding the completion of the last job the latter part of January, 1944.

5. Complainants call attention to the rules as to the character and degree of proof required of a fiduciary in his accounting citing among other authorities Gibson, Secs. 46 and 449 and especially Wooton Land & Fuel Co. v. Ownbey, 8 Cir., 265 F. 91, wherein it is said among other things that the accounting party must prove any allowances or credits he claims to have been expended on behalf of his principal, that he should present an itemized statement showing the details of expenditures, with the vouchers, receipts, and memoranda supporting

his claim; that he should show in detail, and not in round sums, the items expended, and show when, to whom, and for what purpose the payments were made, so that his principal can make a *reasonable test* of the *accuracy of his claim.*

6. It is then argued in the brief in support of this assignment that the Master disregarded the order of reference in that he put the burden of proof on complainants to show that the items claimed by defendant were not proper credits. Further that the Chancellor compounded the error of the Master by concurring in the report.

It, therefore, is in order that we examine into what in fact did occur.

The original bill alleged that upon delivery of Smith's equipment at the first job site it was in such bad condition that Smith had agreed he would be charged personally with all costs of repairs; that under the latter part of paragraph 4 of the contract, Smith had arbitrarily and improperly charged to the firm as job costs a large number of expenditures for his personal benefit. Upon the strength of this allegation, especially, and because of the whole tenor of the bill charging Smith with bad faith and breaches of his contract with the firm, the Chancellor placed on Smith the burden primarily of going forward with the evidence in stating the account.

The order of reference further provided that the parties might mutually employ an accountant to make up a balance sheet with proper schedules, with leave for all parties to surcharge and falsify same, in which event the audit should be charged to the firm. This was not availed of, however, because presumably complainants had employed an auditor several months before the suit was

filed, who had full access to the books and records for a month and a half, and his report is the basis of the figures set up in the bill.

In July, 1945, Smith filed a statement of the firm account, (Ex. 8, Spain), which is a balance sheet prepared by a competent accountant, H. M. Spain, junior.

On motion of complainants and without objection of defendant, defendant deposited in court the books of account and a large amount of supporting invoices, checks and other papers.

Later on, complainant Robichaud deposited in court a box of firm records which had been in his possession and not in the firm's head office in Memphis.

Pursuant to order, the complainants filed Exhibit 55, above referred to, which is simply a listing of 458 disputed items without specification of reasons.

It developed later in the taking of proof that complainants conceded that the several expenditures were actually made, but they disputed them as being proper job costs.

Defendant proved by Collins, as head bookkeeper in the Memphis office, that the books were properly kept and were correct; that it was a part of the general duties of Robichaud, as field office man, to approve invoices that were sent to Memphis to be charged to the firm instead of to Smith individually and that he did so.

Robichaud testified that the firm books were a splendid set of books, were accurately kept and that he had no fault to find with them in that regard.

Spain testified to the correct manner in which the books were kept.

Defendant offered complainants full access to any records they might find in the Memphis office. The

Master was ''impressed by the invoices and vouchers, and the things which they ( defendant's office men) have produced, and I have the feeling that they are pretty complete.''

In response to complainants' Exhibit 55, defendant moved to make more specific, but the motion was disallowed. Defendant filed Exhibit 9, Spain, which he testified is an actual audit, showing for each item the date, payee, amount, by whom check drawn, job, invoices approved or not, and for what paid. Complainants' auditor, though present, did not testify.

Most of the invoices on the Meridian job were approved by Lancaster or employees, only a few by Robichaud because he was looking after Mansfield at that time. Most of Mansfield and Modoc were approved by Robichaud, many by employees. Some on all jobs were not approved, which is in part accounted for by the fact that there was no invoice received as for example on whiskey for ''entertainment'' expense.

Complainants' counsel intimates that since there is an appreciable number of items not approved by any one of complainants, the item should perforce be disallowed. We see no merit in this idea. The test was whether the nature of the item made it a proper job cost.

On the other hand, it is quite significant that so many were approved by either Robichaud or by Lancaster and so few by Smith. It is apparent from the record that these two complainants had full knowledge of how the charges were being made and never objected. The same cannot be said of Eastman because his job mainly was supervising the repair and maintenance of the equipment, yet that does not change the test as to whether they were proper job costs.

■ Suffice it to say, the real basis of complainants' objection to these items was just that. Therefore, when the Master found from the evidence that they were all proper job costs, he was not only justified but properly overruled them en masse; there was no point in repeating this after each item allowed.

For the same reason the Chancellor properly approved his action.

■ In order that we may not be misunderstood, however, we are not bound by the concurrent finding of the Master and Chancellor on such a basic question of the rights of the parties. Such questions should be decided by the Chancellor before the reference to state the account is ordered; the Master's function is only ministerial—to take and state the account in accordance with the rights of the parties already decided by the Court.

Gibson, Sec. 595.

■ However, any matter may be referred to the Master, if the parties consent or do not make timely objection, and without preliminary determination of principles.

Gibson, Secs. 595 and 599.

Smith v. Frazier, Tenn. Sup., 222 S. W. (2d) 367.

■ Complainants made no objection and cannot now complain of the action of the Chancellor as they do in the brief.

A failure to except, however, does not waive the right to have this court review the decree of the Chancellor de novo as though there had been no concurrent finding of the Master and Chancellor.

Viewing it simply as the decree of the Chancellor, which is prima facie correct, unless the evidence preponderates against the decree, we are of opinion that the evidence not only does not preponderate against the decree, but definitely supports the decree.

As to repairs to rented equipment the proof is ample and undisputed that the custom of the trade is that the lessee must repair and maintain the equipment in operating condition, ordinary wear and tear excepted; that Smith's equipment was in average working condition at the beginning and that complainants were fully acquainted with its condition and that the equipment did the work and that it had to be repaired after the jobs were finished.

The other items such as fuel, grease and oil, tires and tubes, insurance, labor, telephone and telegraph, entertainment, office expense, etc. (last page of Ex. 12) either speak for themselves or are clearly shown by the evidence to be job costs.

We are further of opinion that the accounting before the Master was fully in line with rules announced in the cases of—Myers v. Bennett, 71 Tenn. 184, 186; State ex rel. Stewart v. Follis, 140 Tenn. 505, 519, 205 S. W. 320; and Nashville Packet Co. v. Neville, 144 Tenn. 698, 705, 235 S. W. 64, wherein among other things, it is held that where the accounts are complicated, the books and vouchers are voluminous and require examination and explanation by experts, the proper practice is not to require the Master or the Court to make an original examination of the books, etc., but to have expert accountants make up audits and then testify what is shown by the books.

One other criticism is that the Master reversed the order of reference and placed the burden of proof on complainants. We have already recounted without too much detail what occurred and we find no merit in the point.

Now, finally as to the amount allowed as job expenses and as to the questions raised by assignments

V and VI, they are all matters of accounting not involving questions of law on which there is a concurrent finding of the Master and Chancellor, which is binding on this court and precludes our going into them.

Assignment VI is overruled.

Pursuant to what we have heretofore said, this part of the decree is correct.

It is unnecessary to pass on defendant's assignments of error. Since defendant has waived a judgment for any excess that may be due him, the decree below is affirmed and decree will be entered here accordingly with costs against complainants.

Anderson, P. J., and Baptist, J., concur.